THE PEOPLE OF THE STATE OF NEW YORK ex rel. THE PENNSYL-VANIA GAS COMPANY, Relator, *v.* THE PUBLIC SERVICE COMMIS-SION OF THE STATE OF NEW YORK and WILLIAM A. PRENDERGAST and Others, Commissioners, Constituting the Public Service Commission of the State of New York, Respondents.

Third Department, January 10, 1923.

Gas and electricity — rate — rate base for determining rates for natural gas supplied from Pennsylvania fields to residents of New York — Public Service Commission did not err in deducting approximately twenty-nine per cent of cost of reproduction of plant of relator properly allocated to New York — capital increase — deduction from actual value of property of amount collected for capital depletion improperly made — no proof that sum deducted was collected from consumers for depletion and used to increase capital rather than replace it — sum actually collected for depletion not shown to have been used for capital increase rather than for replacement of known capital destruction.

In proceedings to determine the rate base for the purpose of fixing rates for natural gas supplied from fields in Pennsylvania to residents of New York, where a part of the gas was supplied to consumers in Pennsylvania, the Public Service Commission properly deducted approximately twenty-nine per cent of the cost of reproduction of that part of the plant allocated to New York, where, though testimony was given that the maximum depreciation of the property

was ten per cent of the value of similar property when new, still it appeared that the gas company had made a report under oath to the New York State Tax Department shortly before the decision by the Public Service Commission, to the effect that the property in question had suffered a depreciation from the original value of about forty per cent.

The Public Service Commission found that the present fair actual value of the gas wells, gas fields and gas rights was $12,000,000. It deducted from that amount $9,863,889 which the gas company carried on its books in the depreciation account, less the sum of $1,156,020, traceable into free investments made by the company. This deduction was made upon the theory that the amount carried in the depreciation account represented money collected from consumers for depletion, and that, therefore, the consumers should not be required to pay a return thereon, and that said sum was no part of the company's own investment.

*Held,* that the deduction was improperly made, as there was no proof that the sum so deducted was used to enhance or increase the capital rather than for replacement of known capital destruction, caused by the consumption of the natural gas;

That the sum so deducted was not entirely made up from money collected from consumers for depletion of capital, but was made up in part from mere book-keeping entries;

That the gas fields have been depleted, and it cannot be said from the proof that the extent of that depletion has not been the sum actually collected from consumers to repair the depletion, nor can it be said from the evidence that the sum of $12,000,000 fixed by the Commission as the present fair actual value of the gas fields does not reflect value attained by appreciation in excess of a depreciation amounting to the sum so collected, and so it cannot be said that the sum collected for depletion reflects capital increase and should be deducted from the value of the gas fields in determining a rate base.

CERTIORARI issued out of the Supreme Court and attested on the 28th day of September, 1921, directed to the Public Service Commission of the State of New York, commanding it to certify and return to the office of the clerk of the county of Albany all and singular its proceedings, and those of its predecessor, the Public Service Commission of the State of New York, Second District, had in determining and fixing the rates to be charged by the relator, the Pennsylvania Gas Company, for natural gas sold in the city of Jamestown and adjoining territory.

*Marion H. Fisher* [*John E. Mullin* of counsel], for the relator.

*Thrasher & Clapp* [*Louis L. Thrasher* of counsel], for the original complainants.

H. T. KELLOGG, J.:

The relator is a public service corporation which supplies natural gas to consumers in the city of Jamestown, N. Y., as well as to consumers in various cities in the State of Pennsylvania. The gas is drained from extensive gas fields owned or leased by the relator in the State of Pennsylvania. It is piped from wells upon

such fields to a pumping station at Roystone, Penn. From this station it is pumped through a main pipe line into the city of Jamestown, N. Y., and there piped to consumers. Gas is also pumped from the Roystone station into the houses of consumers in various Pennsylvania cities. Of the natural gas furnished to all customers the New York State consumers use twenty-six and eight-tenths per cent while the consumers in Pennsylvania use seventy-three and two-tenths per cent. In order to obtain a rate base for fixing rates for natural gas sold by the relator in James-town, N. Y., the Public Service Commission separately considered and valued three classes of properties belonging to it. The classes are as follows: (1) Properties used exclusively in the New York service, including the main pipe line leading from Roystone, Penn., to Jamestown, N. Y. (2) Properties, excepting gas fields and wells, but including the Roystone station and pipe lines leading thereto from the Pennsylvania gas fields, commonly used in supply-ing New York and Pennsylvania consumers. (3) Gas fields and wells employed to supply the Roystone station with gas for con-sumers in both States. The Commission determined that such proportion of the properties of the second and third classes as the volume of gas sold in New York bore to the entire volume of gas sold, or twenty-six and eight-tenths per cent, should be allocated to New York. It determined that the value of the properties in the first class was $1,000,000. To this valuation it added $311,088 for working capital, overheads, etc., making a total value of $1,311,088. It determined that the value of the properties in the second class, allocated to New York, together with overheads, etc., was $1,500,000. It determined that the fair value of the properties in the third class was $12,000,000, and after deducting therefrom the sum of $8,707,869, for reasons hereinafter given, it allocated to New York twenty-six and eight-tenths per cent of the difference between these sums or $882,291.11. It thus found that the capi-tal which the relator employed in its New York business was $3,693,379.11, and employed that sum as the base for determining the rates to be charged in Jamestown, N. Y.

In valuing the relator's properties in classes 1 and 2 the Commission considered cost of reproduction rather than original investment. It made deductions from such cost figures of an estimated difference between the value of such properties new and their value as depreciated. The evidence showed that the cost of reproducing the properties in class 1 was $1,401,542, and that the cost of reproducing that portion of the properties in class 2 which was allocated to New York was $2,113,576. In reaching the result that the value of the property in the first class was

$1,000,000 and that the value of the New York portion of the properties in the second class was $1,500,000 the Commission in the first instance deducted for depreciation $401,542, and in the second instance $613,576, or in each class approximately twenty-nine per cent of the cost of reproduction. Testimony was given that the maximum depreciation of these properties was ten per cent of the value of similar properties new. On the other hand, there was in evidence a report made by the relator to the New York State Tax Department for the year 1917 in which the relator made statement, under oath, that the properties in question had suffered depreciation from original value of .397000337. It is obvious that opinions given as to the extent of plant depreciation must in all cases consist of approximate estimates only. In view of the fact that the relator itself had in 1918 estimated that the property in question had depreciated approximately forty per cent, we do not feel that the decision of the Commission made shortly thereafter that the property had depreciated approximately thirty per cent was unwarranted by the proof. We conclude, therefore, that the Commission made no error in its valuation of these properties.

The Commission determined, as stated, that the present fair value of the relator's gas wells, gas fields and gas rights was $12,000,000. Concerning this valuation the Commission said: " The value of twelve million dollars ($12,000,000) which is claimed in the brief of its counsel for its developed gas properties in Pennsylvania is sustained by the evidence." It said further: " The very small amount invested by the company in the property originally, or even the amount at which it is carried upon its books, cannot, I think, be used in lieu of the actual value of the property as reasonably established by many disinterested witnesses." It found that the relator had from the year 1891 to 1917, inclusive, carried upon its books certain amounts totaling $9,863,889 in depreciation account. It found that of this sum $1,156,020 was traceable into free investments made by the relator. It made deduction of this latter sum and determined that the difference, or $8,707,869, should be deducted from $12,000,000, the present value of the relator's gas fields, leaving $3,292,131, the figure to be used for the capital of relator invested in such fields, twenty-six and eight-tenths per cent of which should be credited to the New York business.

The deduction from $12,000,000, the value fixed for relator's gas fields and rights, of $8,707,869 found in depreciation account, was not made upon the theory that the relator, having by its book figures admitted depreciation in the amount named, should be held to such figures. No such theory was tenable for the reason that

the Commission was not dealing with a problem of book valuations in the solution of which it might have been permissible to have deducted book figures of depreciation from book figures of investment. The Commission had already found that the present day actual fair value of the gas fields and rights was $12,000,000. There was necessarily involved in the making of this finding all proper deductions for depletion or depreciation. No further deductions for actual depreciation, therefore, could consistently have been made. The Commission made the deduction upon a wholly different theory. After stating the value of the gas rights to be $12,000,000, it said: " There is, however, in this connection a very important element to be considered. This company for years very properly set aside from its revenues, as an operating expense, a substantial sum annually to make good the depletion of its capital by reason of the consumption of the natural gas and the constant diminution of the amount of that commodity which it owned, by sale and consumption." It stated that the relator had from time to time collected from consumers the sum of $9,863,889; that this sum " was collected from the customers of this company to make good the depletion of capital consequent upon its operations;" that it " was a *quasi* trust fund for that purpose." It said that this sum " was invested very largely, and properly so, in the assets of the company, and to the extent of such investments this trust fund in a sense belongs to the consumers and they cannot properly be required to pay a return upon their own property." It further said: " If we assume that the entire free investments of this company, aside from the plant and equipment, which amounted at the close of 1919 to $1,156,020, represents to that extent this ' depletion ' fund, we still have a balance of $8,707,869 as the amount of this fund held by this company as an investment in its fixed capital used for gas production, which must be deducted therefrom as being no part of its own investment and no part of the fixed capital upon which it is entitled to a return."

The Commission seems to have determined that all sums of money collected from consumers for depletion of capital and carried to depreciation account, less such sums as might be traceable into free investments, whether used for replacement or enhancement of capital, constituted a fund which, whatever its converted form, could not be included in reckoning the capital constituting a proper rate base. That this cannot be true is shown by a simple illustration. Assume that the relator were presently embarking in the natural gas business; that it owned ten wells each having its own acreage of gas fields; that each well with its fields was

**78**     People ex rel. Penn. Gas Co. *v.* Pub. Serv. Comm.

Third Department, January, 1923.                    [Vol. 204

fairly worth $10,000; that consumers would so deplete its gas supply that in ten years the ten wells and fields would be exhausted. It is plain that in such case the consumers should annually pay, in addition to a suitable charge for service, the value of one gas well and field, or the sum of $10,000. If the consumers paid such a charge for ten years then the relator might each year buy a new gas well with new fields, or at the end of ten years buy itself ten new wells with gas fields, and thus place itself, not in a better, but in the exact position occupied by it when it began business. Clearly in such case the relator should be allowed a continuance of its charges for gas based on the full value of its capital without deductions. If sums annually collected from consumers for depletion of capital and actually used for such replacement must be deducted from capital invested to determine a rate base then it is not apparent why such collections are ever permitted. If the Commission intended merely to determine that sums of money collected for depletion which added to capital should be deducted, then the Commission was likewise in error when it made the deduction in question. This is true for the reason that there is no proof that the sum of $8,707,869 was collected from consumers for depletion and used to increase capital rather than to replace it.

It is not the fact that the sum of $8,707,869 plus the $1,156,020 traceable into free investment, or $9,863,889 in all, was collected by the relator for the purpose of making good its depleted capital. From the year 1891 to the year 1913, inclusive, except in the years 1902 and 1908, relator annually charged against operating revenue a sum of money averaging approximately $200,000, crediting the same to depreciation account. The total sum of money thus charged and credited during such years was $4,155,439.25. In no other year was any sum of money whatever thus collected, charged and credited. It is true that the balance sheets of the relator show that in addition to the sum named further sums amounting to $5,708,449.75 were from time to time credited to depreciation account. These credits, however, were mere bookkeeping entries, were not balanced by earnings received, and did not reflect collections made from customers for capital depletion. Thus in the year 1905 the gross earnings of the relator were $885,565.71 while its net earnings, not deducting charges for depreciation, were $597,160.11. The sum of $311,117.28 was that year charged against earnings and credited to depreciation. Yet we find from the balance sheets that depreciation account was that year increased by the sum of $4,055,510.52, or nearly five times the gross and seven times the yearly net revenue. We, also, find from the same balance sheets that a bookkeeping entry

was that year made increasing the apparent assets of the relator by the sum of more than $6,000,000. Thus the relator made certain readjustments, increasing more or less arbitrarily the book value of its assets on the one side of its ledger while increasing its liabilities, such as depreciation, on the other side, in order thereby to strike a balance. The remainder of the $5,708,449.75 is accounted for by similar bookkeeping readjustments. Thus it appears that the Commission was in error in its statement as to sums of money collected from consumers for capital depletion. The utmost sum which upon any theory can be said to have been so collected was $4,155,439.25.

The proof does not establish that the sum of $4,155,439.25 was used to enhance rather than to replace capital. The book figures showing original investment, coupled with the finding of the Commission as to the present value of the relator's gas fields and rights, show that there has been in the course of time an appreciation in the value of such fields over cost amounting to many millions of dollars. This may have been due to the acquisition of new fields, to the sinking of more wells, to unexpected increases of gas flow, to increased demands for gas, to increased prices received, or to many other causes. On the other hand, it is certain that during the forty years of relator's business history enormous quantities of gas have been drawn from its fields and destroyed by its consumers. To that extent there has been depletion. It cannot be said from this proof that the extent of that depletion has not been $4,155,439.25. It cannot be said that so far as that sum of money has been used to buy new fields or sink new wells the use has not been for purposes of replacement of known capital destruction. It cannot be said that the sum of $12,000,000, fixed by the Commission as the present fair value of the gas fields, does not reflect value attained by appreciation in excess of a depreciation amounting to $4,155,439.25. Therefore, it cannot be said that the sum named reflects capital increase and should be deducted from the value of the gas fields in reckoning a rate base.

For the reasons stated the determination should be annulled, with fifty dollars costs and disbursements, and the proceeding remitted to the Commission for further consideration.

KILEY, VAN KIRK, HINMAN and HASBROUCK, JJ., concur.

Determination annulled, with fifty dollars costs and disbursements, and proceedings remitted to the Commission for further consideration.