# Erie City et al., Appellants, v. Public Service Commission.

*Public service companies — Natural gas companies — Rates — Valuation of property—Pipe lines to another state.*

1. Pipe lines of a natural gas company used exclusively in the service of gas to consumers in an adjoining state from a compressor station in Pennsylvania, cannot be specifically made the subject of any rate base for Pennsylvania consumers, although they may be considered in a general value of all the company's property. Page 518.

*Public service companies—Valuation for rates—Status of property—Decision of state courts.*

2. Decisions of a state court relative to a property status constitute rules of property, and must be accepted and applied in passing on consumers' rights. The law of stare decisio applied. Pages 520, 525.

*Public service companies—Natural gas companies—Nature of property in gas and oil—Freehold.*

3. Natural gas and oil belonging to the owners of the land; they are the subject of sale, separate and apart from the surface. They may become a freehold. Pages 520, 521.

*Public service companies — Natural gas companies — Rates — Fair returns—Valuation of lands—Market value—Original value —Present value—Depletion—Constitution—14th Federal Amendment—Condemnation.*

4. Generally speaking the value of property used in public service is to be determined at the time of the investigation regarding rates. Page 521.

5. The standard applied is its then present value as part of the rate base. Page 521.

6. Reproduction cost, an element of present value, may include the increment attaching from increased cost of labor and material. Page 521.

7. Cost, or actual investment, though considered in the rate base, does not indicate the value of property. Page 522.

8. Present value is the basis on which bargains and sales are conducted; it is the economic rule of equality of exchange. Page 522.

9. Original cost, plus the cost of production, as a measure of value or worth, is a new economic theory of value and sale differing from that applying to the sale of other commodities. Page 523.

10. Present value includes at the time fixed such elements as depreciation, depletion and the like. Page 523, cf. No. 23.

11. Property purchased from earnings is private property, to be included in a rate base. Utilities are not to be denied an adequate return on this class of property; it is not the subject of confiscation for the benefit of the rate-payer; nor is the public entitled to share in such property. Page 524.

12. The business of supplying gas is national. The property is affected with a great public interest; but such circumstances do not differentiate these holdings from any other class of property in private ownership. They may not be taken without due process of law. Pages 523, 524, 525, 526.

13. If the property, rightfully a part of the rate base, has increased in value since it was acquired, the company is entitled to the benefit of that increase. Page 525.

14. The fact that, since the adoption in 1897 of the rule of present value, securities and properties have been sold, money borrowed in reliance thereon, and property rights have become fixed, is the strongest reason for sustaining the rule of present value, though it may be subject to some indefiniteness. Page 525.

15. The present value of lands is fixed by the present market value, but a greater value cannot attach to them because they are used in public service. It is general market value outside of that service approximating the rule of just compensation in condemnation cases. Page 525.

16. A rate base includes elements not properly cognizable in condemnation cases. Page 526.

17. Property in a condemnation case is protected by protecting value. Page 526.

*Public service companies—Gas lands—Used, useful and fair reserve.*

18. Gas holdings should be included and evaluated only to the extent they represent developed, used and useful territory, including reasonable reserve. They are to be considered in the rate base at their present value. Page 526.

19. The value of gas lands is not the selling price of a cubic foot of gas as applied to a supposed quantity in a given field; value is fixed as a whole, or at so much per acre. Page 528.

*Public service companies—Fair reserve—Value not included in rate base—Commission's powers—Rate on all property—Rate on fair reserve.*

20. All property is not necessarily included in the rate base. If a part of it is not now devoted to public service or necessary therefor, as a reasonable reserve, the consumer is not required to pay a return on that part. Page 529.

21. In ascertaining the property used, useful and fair reserved, the purpose for which the holdings were acquired, and their physical characteristics unique to that class, must be considered. Property may have a higher value because of its strategic as distinguished from its monopolistic position, and its productivity may influence value. Present or market value should include these items. Pages 530, 531.

22. In endeavoring to find a fair reserve in any corporation, the commission acting as an administrative body, must decide the question in each case subject to the right of appeal to the court. Page 531.

23. All property, including that in reserve, is entitled to a fair return on the rate base; in addition there should be added, in utilities like the present, payment for gas taken out and used. This comes under depletion allowance. Page 531, cf. No. 10 and page 536.

24. As to lands held in reserve, the same rules of value apply for the rate base, as for those in actual use. Page 531.

*Public Service Commission—Evidence—Misconception of evidence—Reasonable judgment—Lump sum.*

25. The commission is controlled by the evidence before it, not by reports not offered in evidence. A finding without such evidence is arbitrary and baseless, and the misconception of the legal effect of evidence is equally fatal. Pages 527, 528.

26. The commission is not a mere machine in fixing values; it reaches its conclusion in the same manner as any other tryer of fact, possessing and exercising a reasonable judgment. They may not indulge in a capricious disbelief or an undue disregard of evidence submitted. Page 529.

27. Where a finding shows a wide departure from undisputed evidence of such magnitude as to show an abuse of power, it is the duty of the court of first instance to remand the case for further report. Page 529.

28. Lump sums or partial lump sum values are unfair. The report should show in each instance in plain language how much the commission allows for the different standard heads of valuation followed the total value or rate base. Page 533.

*Going-concern value — Depreciation — Profits from other business.*

29. Utilities are entitled to a going-concern value when it appears in the evidence. Page 533.

30. The commission should find the rate to be applied for accrued depreciation, if any. Pages 534, 535.

31. Profits from a business independent and outside of the public service law should not be considered in fixing the rates. Pages 534, 535.

32. But the company is entitled to rents or other sums for the use of the utility's properties in such business. Page 535.

Argued September 25, 1923. Appeals, Nos. 99, 100 and 105, Oct. T., 1923, by the City of Erie, Warren Borough and Pennsylvania Gas Company, from judgments of Superior Court, April T., 1922, Nos. 125, 128 and 129, affirming orders of Public Service Commission, in cases of City of Erie and Warren Borough v. Pennsylvania Gas Company. Before Moschzisker, C. J., Frazer, Simpson, Kephart, Sadler and Schaffer, JJ. Reversed.

Appeals from Superior Court. See 81 Pa. Superior Ct. 65.

The opinion of the Supreme Court states the facts.

Order of Public Service Commission affirmed. City of Erie, Borough of Warren, appealed in Nos. 99 and 100 and Pennsylvania Gas Co. in No. 105.

*Error assigned* was, inter alia, judgment, quoting it.

*J. E. Mullin,* with him *W. Pitt Gifford, Charles H. English* and *J. H. Alexander,* for Pennsylvania Gas

Company.—The company owns the gas in the ground in fee: Hamilton v. Foster, 272 Pa. 95; DeWitt's Est., 266 Pa. 548; Citizen's Gas Co. v. Whitney, 232 Pa. 592; Rockwell v. Warren County, 228 Pa. 430; Barnsdall v. Gas Co., 225 Pa. 338; Prager's Est., 74 Pa. Superior Ct. 592.

The company's gas producing properties being land used in the public service must be valued at their present market value: Denver v. Water Co., 246 U. S. 178; Wilcox v. Gas Co., 212 U. S. 19; Minnesota Rate Cases, 230 U. S. 352; Mississippi & Rum River Boom Co. v. Patterson, 98 U. S. 403; United States v. I. C. C., 252 U. S. 178; Galveston Elec. Co. v. Galveston, 258 U. S. 388; Ben Avon Boro. v. Water Co., 68 Pa. Superior Ct. 561, 260 Pa. 289, 253 U. S. 281, 75 Pa. Superior Ct. 290, and 271 Pa. 347; Mercersburg, etc., Elec. Co. v. P. S. C., 76 Pa. Superior Ct. 58.

The company is entitled to a reasonable return on the fair value of its property used in the public service at the time the determination is made: Smyth v. Ames, 169 U. S. 466; Southwestern Bell Tel. Co. v. P. S. C. of Mo., U. S. Adv. Ops. 1922-23; Bluefield Water Works & Imp. Co. v. P. S. C. of W. Va., U. S. Adv. Ops. 1922; Minnesota Rate Cases, 230 U. S. 352.

The status, under the federal Constitution, of gas in the ground as property, depends, in this case, on the law of Pennsylvania: Guffey v. Smith, 237 U. S. 101; Swearingen v. Barnsdall, 210 Pa. 84.

The "just compensation" required by the constitutions means the "perfect equivalent" in money of the property taken: Seaboard Air Line Ry. v. U. S., U. S. Adv. Ops. 1922-23; Monongahela Nav. Co. v. U. S., 148 U. S. 312; Com. v. Pittsburgh, etc., R. R., 58 Pa. 26; United States v. Collieries Co., U. S. Adv. Ops. 1922-23; New York v. Sage, 239 U. S. 57.

Natural gas as a commodity, after being produced, is entitled to the protection of constitutional guaranties, the same as any other property.

The constitutions make no distinction as to the kinds of property which are entitled to protection of the due process and equal protection clauses, etc.: Regan v. Farmers L. & T. Co., 154 U. S. 362; Wapsie P. & L. Co. v. Tipton, 193 N. W. Rep. 643; Chicago, M. & St. P. Ry. v. Minnesota, 134 U. S. 418.

*C. E. Bordwell,* with him *Earle MacDonald,* for the Borough of Warren, *E. M. Murphy,* and *M. C. Cornell,* for the City of Erie.—For gasoline extracted from the company's product an allowance should be made as an operating revenue.

The gas holdings of the intervening appellee should have been evaluated at their original cost less depreciation. Respondent has failed to establish valuation of its gas holdings: Searle v. R. R., 33 Pa. 57; Pittsburgh, Virginia & Charleston Ry. v. Vance, 115 Pa. 325; Michael v. Pipe Line Co., 159 Pa. 99.

Respondent, in setting up its theory of accrued depreciation, has confused the present efficiency of its plant with its cost and its value.

*Frank M. Hunter,* with him *John Fox Weiss,* for Public Service Commission.

*J. B. Cessna* and *A. W. Mitchell,* filed printed brief for interested party under Rule 61.

OPINION BY MR. JUSTICE KEPHART, January 7, 1924:

These three appeals relate to the action of the Public Service Commission in fixing a rate to be applied by a utility furnishing natural gas in the northwestern part of the State. As the appeals have several questions in common, we shall determine all in one opinion.

The Pennsylvania Gas Company, hereinafter termed the company, filed in the proper office successive increases in rates. Complaints were filed thereto by the Borough of Warren, the City of Erie, and individual

consumers living therein.  For brevity, the complainants will be termed municipalities.  The commission, in its final determination, fixed a value of $14,380,000 on the company's property attributable to Pennsylvania, applying a rate of fifty cents per thousand to a production of approximately four billion cubic feet of gas furnished each year.  Appeals were taken to the Superior Court; the six judges hearing the appeals were divided in opinion; these appeals were duly allowed.

The property in public service lies principally in Pennsylvania, but also extends into New York.  That wholly devoted to this State begins at the compressor station at Roystowne, thence to Warren, Cory and Erie, and the distribution plants therein.  Pipe lines used exclusively in the service of gas to consumers in New York lead from the compressor station to the city of Jamestown, with the distribution plants and property in that city and vicinity.  The latter, while considered in the general value of all the company's property, could not be specifically made the subject of any rate base for Pennsylvania consumers.

A third class of properties, used jointly by the consumers of both states, consists of gas lands in actual use, the wells, the equipment therein, the gathering lines in the field, and the pipe lines leading therefrom to the compressor station at Roystowne.

As one of the questions we are asked to decide is connected with the joint properties, further brief details will be necessary.  The company is the owner of 132,000 acres of gas lands, leaseholds, etc., in McKean, Elk and Forest Counties, 119,000 acres in fee, carrying no other interest in the land except the gas, with the right to explore for, take and remove it.  These lie in two principal productive territories, one designated the Elk field, including sixteen selected warrants of 12,732 acres, with 122 wells, ninety-two being active; the other, the Ludlow field, contains 40,000 acres, with 494 producing wells.  Gas has been taken from this territory for a

long time. The company, during these proceedings, acquired the additional property of the Tricounty Natural Gas Company. Seventy-three per cent of all joint property was chargeable to Pennsylvania; the remainder to New York. Of this character of property our present inquiry is confined to the value of the three divisions of gas lands last mentioned; no claim for value is now made for the remaining gas lands.

An engineering conference to determine a fair rate was organized, composed of representatives from the commission, the company and the complainants. This body submitted a statement agreed to by all members showing reproduction cost of the physical properties, plant equipment, pipe lines and appurtenances. Their report gave a complete inventory. It was received, accepted and approved by the commission; no evidence appears to the contrary. The committee could not agree upon the value of the gas lease holdings or gas lands, the franchise in Erie, working capital, bond discount and brokerage, capital requirements, depreciation and going-concern value. The attack on the commission's findings is based on these items. The questions presented are: What is a proper value of the gas lands, rate of return on property employed in public service, depletion allowance, going-concern value? And should not the value of gasoline sold by another company be considered in the return? Some minor questions are raised, but we do not consider them of merit; the assignments directed to them are accordingly dismissed.

Three judges of the Superior Court supported the theory that "the gas holdings should be valued at their original cost; that, though treated as real estate for many purposes, they are not of the same permanent character as ordinary land and the improvements thereon, but are consumed by use and after a term of years are wholly exhausted; that they should be treated, rather, as a stored product which the company will sell in the course of years and eventually exhaust; that the

purchase of additional gas rights, the reasonable cost of prospecting for gas, the drilling of wells, etc., should be allowed as operating charges, necessary to secure the product which the company sells; and that the commission erred as matter of law in capitalizing the company's gas holdings at their present value." This is substantially the position of the municipalities; in addition they urge the rates were unfair and unreasonable.

The theory of the utility, the commission and the other judges of the Superior Court was, that of present value of the entire property used and useful in the public service, including the gas-producing lands.

Decisions of a state court relative to a property's status "constitute rules of property and must be accepted and applied in passing on complainants' rights": Guffey v. Smith, 237 U. S. 101, 113. The right of property in natural gas and oil in all the states save Indiana, as stated in Brown v. Spilman, 155 U. S. 665, 669, belongs to the owners of the land; they are a part of the land so long as they are on it or in it or subject to control therein. Petroleum, oil and natural gas can be severed from the ownership of the surface by grant or exceptions as separate corporeal rights: Kansas Nat. Gas Co. v. Haskell, 172 Fed. 545, affd. 221 U. S. 229, S. C. 224 U. S. 217. In our State, in Hamilton v. Foster, 272 Pa. 95, 102, we held that oil and gas are minerals, and while in place are part of the land. They may be the subject of sale, separate and apart from the surface, and from any other minerals beneath it. They belong to the owner in fee, or his grantee, as long as they remain part of his property, though use is not possible until severed from the freehold exactly as done with all other minerals beneath the surface. This is the effect of Mr. Justice VAN DEVANTER's decision in Pa. v. West Virginia, 262 U. S. 553, 586, 43 Sup. Ct. Rep. 658, 660, when he said "natural gas is found at pronounced depths in various strata, usually sand rock, constituting a natural reservoir, and is brought to the surface and reduced to possession

through wells drilled into the containing strata. When a surface owner thus reduces it to possession he becomes its owner, and it becomes a subject of commerce like any product of the forest, field or mine." Oil and gas are minerals in which a freehold of inheritance may be created: DeWitt's Est., 266 Pa. 548; Citizens' Gas Co. v. Whitney, 232 Pa. 592; Rockwell v. Warren County, 228 Pa. 430; Barnsdall v. Bradford Gas Co., 225 Pa. 338; Prager's Est., 74 Pa. Superior Ct. 592.

Being a freehold, to which value attaches while enclosed under the ground, how then shall they be valued for rate-making purposes?

Generally speaking, the value of private property used in public service and affected with a public interest is to be determined at the time of the inquiry or investigation regarding rates: Willcox v. Consolidated Gas Co., 212 U. S. 19, 52, cited in Georgia Ry. Co. v. R. R. Comm., 262 U. S. 625, 631, 43 Sup. Ct. Rep. 680, 681; Denver v. Denver Union Water Co., 246 U. S. 178. And the standard applied is its then present value: Smyth v. Ames, 169 U. S. 466, 546; Paducah v. Paducah Ry. Co., 261 U. S. 267, 272; Southwestern Bell Tel. Co. v. P. S. C. of Missouri, 262 U. S. 276, 287, 43 Sup. Ct. Rep. 544, 546; Georgia Ry. Co. v. R. R. Comm., supra, 630; Bluefield, etc., Co. v. P. S. C. of West Virginia, 262 U. S. 679, 690, 43 Sup. Ct. Rep. 675, 678. The standard of present value for a rate base has received much attention in the courts. It first found expression in Smyth v. Ames, supra, and has since been followed by courts and commissions notwithstanding attacks on it. Indeed, in the Southwestern Bell Case and in the Bluefield Waterworks Case, supra, in holding present value as a proper element for the legal rate base, also held that reproduction cost embraced the increment attaching from increased cost of labor, material, etc.

Finding the rate base is a stubborn and at times a difficult task, and present value (its chief element) is the storm center, even as to lands such as we are now

considering; but, though that theory may be slightly indefinite, original cost is a creature having the same frailties, only in a more aggravated state. The assembling of materials on which to base a judgment of true value is more certain in the former. Time has usually wiped out much of the evidence to show original cost. The records then kept did not account for all the various items entering into it, nor do the books of to-day, though kept with meticulous care, exactly cover such items. As stated by Mr. Justice BRANDEIS in his concurrence in the Southwestern Bell Case, wherein the present value method is assailed, in what may be termed the last word on the subject: Originally, "stocks and bonds did not indicate the amount of capital embarked in the enterprise, depreciation accounts were unknown, and book values or property accounts furnished no trustworthy evidence either of cost or of real value." It is here that a part of the difficulty is met, if original cost were adopted as the rule of value; and, as for a sum "prudently invested," based not on judgment but political expediency or other uncertain factor, it is open to the grave charge of favoritism or oppression founded on socialism. It is a matter of very common observation that cost does not indicate the value of property; nor does present value indicate original cost. Present value is the basis on which all bargains and sales are conducted, from the purchase of the smallest article to the sale of gigantic steel mills. It is the economic rule of equality of exchange. Original cost, long since lost sight of, is not the basis of bargain and sale, though it is considered in fixing the present value for a rate base. Original cost cannot be used as a substitute for value. In the Minnesota Rate Cases it was contended that, as the carriers had received public lands as a donation, any value attaching to them should not be included in the rate base. Mr. Justice HUGHES, in disposing of this question, said: "It is clear that in ascertaining the present value we are not limited to the consideration of the amount

of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law": Minnesota Rate Cases, 230 U. S. 352, 454. See also San Joaquin, etc., Co. v. Stanislaus County, 233 U. S. 454. This question was discussed in Ben Avon Borough v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561, 576-8, 581.

If we were to make the return on original cost of these gas lands, plus the cost of production, the measure for the price of gas to be sold to the consumer, we would establish an economic theory of value and sale for this kind of a utility differing from that applied to others. And the fact that gas stored in these lands is taken from thence and sold, ultimately consuming the entire product, does not alter the rule. In that respect it is no different from any physical plant having a life of twenty years,—an oil field or a lumber operation. Present value is what we are now dealing with, and as to gas lands it includes at the time fixed such elements as depreciation, depletion and the like.

True, here successive stock issues (claimed as evidence of cost), some paid for and some reaching the shareholders through stock dividends, were shown, the total amount outstanding at the time of the hearing being $7,300,000. But against this issue we have the total value of the company's property largely in excess of this figure, including as well the value of the gas land. It may be the property representing this total value was secured largely from earnings received from the rate payer, but that does not change its status as private

property so as to eliminate it from the rate base. It is not for that reason to be discriminated against.

The theory of the municipalities, in applying cost basis, that individuals purchasing gas lands,—and there is no reason why, if it is correct, it should not be applied to any species of property,—"should give thanks to Providence" because it is afforded the opportunity of being extremely prosperous and well rewarded through the enormous production sold to consumers from such low-priced lands, overlooks the fact that, no matter what the production may be, the rate (fair return) is applied on the rate base. As production increases the rate must decrease, for the line fixed is fair return on the rate base. "The company is entitled to receive a reasonable return for the service it furnishes, and no more": Citizens' Passenger Ry. Co. v. P. S. C., 271 Pa. 39, 56. These considerations do not give to the owners of this class of lands the same constitutional protection accorded other property. It singles out this land for confiscation for the benefit of the rate payer. We have not yet adopted this system of division of property. Nor can we adopt the other equally erroneous theory that the public is entitled to share in the appreciated value; it is merely a modification of the preceding one; as the point of division could not be controlled by any known rule, it would cause this property to be subject to a will which could be arbitrary, without a governing hand to restrain its application. The same observation may be made as to a "sum fraudulently invested."

While the business of supplying gas is national in character, affected with great public interest, and the commodity a product of nature, such circumstances do not differentiate these holdings from any other class of property in private ownership. There should not be one rule for valuing property generally for rate making, another for gas lands used in public service, another for condemnation, another for taxation, and still another for private sale or exchange. If the property which legally

enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase: Willcox v. Consolidated Gas Co., supra, 52; Georgia Ry. Co. v. R. R. Comm., supra, 631; Bluefield Co. v. P. S. C. of West Virginia, supra, 690.

But there is a more formidable reason why the present value rule should be adhered to. It has only been within recent years that governments have seriously taken up the regulation of public utilities. Prior thereto, and since, the acquisition of property by individuals had a fixed status in the law, whether that property was directly owned, or indirectly through stock in a corporation, "the property is held in private ownership." Smyth v. Ames, supra, was decided in 1897; it recognized the rights in and to such property. Since then courts and commissions in a host of cases have followed the supreme law fixing values. Securities and properties of all kinds have been sold, and money borrowed in reliance thereon. Property rights have thus become fixed, and if there is a place where the law of stare decisis applies, it should be here. It should be changed only when it is apparent the rule works a manifest hardship out of all proportion to any good accomplished by it.

The standard to be applied in fixing present value of the lands would be "present market value": Denver v. Denver Union Water Co., supra, 191; Willcox v. Consolidated Gas Co., supra. In so considering it (Minnesota Rate Cases, supra), a greater value cannot attach because used in public service. The rule is limited to general market value outside the public service, or in a market not considering such service. While this may call for careful scrutiny of the evidence, such considerations afford no excuse for refusing to give the value required by law. The rule was applied in valuing Neville Island: Ben Avon Boro. v. Ohio Valley Water Co., 271 Pa. 346. The test, under the Fourteenth Amendment, in rate cases, is whether the utility is deprived of

its property or a part of its value in the return allowed. The rule of just compensation, as in condemnation cases, should be applied to gas lands (Smyth v. Ames, supra, 546; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 410; Minnesota Rate Cases, supra; Mercersburg, etc., Electric Co. v. P. S. C., 76 Pa. Superior Ct. 58, 65), though generally the rate base may include elements not properly cognizable in condemnation cases. Property is protected by protecting its value, which, in this class, is what it is worth in a fair market. In fixing market value for a present value, we bring the holdings under the constitutional protection governing condemnation for public or quasi public uses.

The commission correctly summarized the law in these words: "Gas holdings should be included and evaluated only to the extent that they represent developed, used and useful territory, including a reasonable reserve for the continued functioning of the company in its public service. Such holdings should be included in the rate base at their present value."

Our difficulty lies in the paragraph immediately following the one quoted from the findings, wherein the commission says, this value "cannot be determined on the basis of what gas can be sold for in some particular locality or in the locality where it is produced." This would be correct if the commodity value was all that was before the commission and it was the basis on which present value was to be reached. The company produced witnesses who testified the market value of the sixteen selected warrants was from $7,212,000 to $10,000,000, and the Ludlow field $4,000,000. It appears these gas fields were developed, defined and have been in actual operation producing gas from a known sand for a great many years, sufficient to show the quality. It is no longer doubtful among those familiar with the business, whether expert geologists or engineers or practical gas-producing men, that the remaining life of the fields can be determined with reasonable accuracy,—with as much accu-

racy as is used in dealing with ordinary affairs of life. While this may be said to be a matter of conjecture, because not seen, as is a seam of coal, and it may suddenly end, the frequency of this in a defined territory is remarkably small. It is on such examinations large sums of money are invested. Most of the witnesses base their estimates on their knowledge of the field in general. The location of the lands was shown, location of the wells, the date each well was drilled, its depth, the character of sand in which gas was found, its thickness, the initial open flow volume of gas, the initial present rock pressure, the line pressure, the volume of gas delivered January, 1920, by each well into the line against the line pressure, together with the details of measurement on which the computation of the present volume is based. The commission finds that the Elk fields had an average daily yield of 102,000 cubic feet, discharging into the lines against a pressure of 115 pounds, and an average daily yield from the Ludlow field of 34,000 cubic feet. Disregarding the testimony of Hill and Gaffney as to value, four other witnesses testified to a demand for the supply and what natural gas lands would sell for in and about that territory. The commission, in valuing the gas holdings, stated, "Taking into consideration the total gas holdings of the respondent, with all the testimony bearing on their present value, we are of the opinion that the used and useful portions attributable to Pennsylvania should be included in the rate base at $5,500,- 000." The lowest value under the evidence was $11,212,000; it is apparent, from what the commission said, they proceeded on an erroneous conception of the evidence. Much, if not all, of the same testimony would have been admitted as evidence of market value in condemnation of the same land. No attack was made on the competency, sufficiency or credibility of the witnesses to establish the fact of general market value.

The commission must in some measure be controlled by the evidence before it. An order is not in conformity

to law if based on reports not offered in evidence and not the subject of cross-examination: P. R. T. Co. v. P. S. C., 78 Pa. Superior Ct. 593; P. R. R. Co. v. P. S. C., 69 Pa. Superior Ct. 404, 411. A finding without evidence is arbitrary and baseless (Interstate Commerce Comm. v. Louisville & Nashville R. R. Co., 227 U. S. 88, 91) and a mistaken conception of the legal effect of evidence is equally fatal.

Some of the confusion in regard to this evidence might be attributable to the company's submitting three theories of valuation: the present value, commodity value, and segregation value; the commission disregarded all but the first. Keeping in mind the purpose for which this evidence was offered, the value of any mineral land must necessarily depend primarily upon demand, quantity, cost of production, and price received for the marketed product. Oil, coal, ore and other minerals are subject to this rule. These considerations must enter into market value. Ordinarily a witness in chief is not permitted to give details of cost or price, but they are considered by the witness when forming an opinion as to market value. See Act of April 21, 1915, P. L. 159, as to evidence in condemnation cases; also Whitcomb v. Phila., 264 Pa. 277; Marine Coal Co. v. P., McK. & Y. R. R. Co., 246 Pa. 478. The landowner, in a condemnation proceeding, is not limited to any one use, but is entitled to have the land considered for any and all uses. He may show that it is specially valuable for a certain, particular purpose, and that purpose may enter into the value before the jury: Cox v. P., H. & P. R. R. Co., 215 Pa. 506.

The value of the land is not the selling price of a cubic foot of gas as applied to the supposed quantity in a given field; its value is fixed as a whole, or at so much an acre. If we exclude this evidence, the finding was not based on any evidence. The commission had properly rejected the segregation and commodity theories, with the evidence bearing specially on such values. To add to this

discarded evidence the testimony above indicated, leaves the case barren of testimony to support value.

While the commission must consider all the evidence presented, it is not a mere machine to record figures placed by witnesses, estimating value of the lands between the highest and lowest on the basis of a fair average. To a very large degree, if not entirely, it reaches a conclusion in the same manner as a jury in a condemnation case; like all tryers of fact, they possess and must exercise a reasonable judgment. They may not indulge in capricious disbelief, or an undue disregard of the evidence submitted, and, as in this case, fix a value wholly disproportionate to the proven facts. Where a finding exists showing a wide departure from undisputed evidence of a contrary import, of such magnitude as to show on its face an abuse of power, it becomes the duty of the court of first instance, exercising independent judgment in reviewing the record, to remand the case to the commission for further report, so there may be placed on record the reason for declining to accept the evidence substantially as submitted, or recast the report if in error.

Here is a difference of $6,000,000. It may be this deduction can be satisfactorily accounted for; if so the commission's report should be self-sustaining, answering in a large measure the relevant contentions of the respective parties. The ascertainment of the market value is not one of "rules or formulas," but on the basis of reasonable judgment.

However, the present value of all the property is not necessarily to be considered in the rate base. Generally speaking, though property may have the value claimed, if a reasonable proportion of its energies or the used and useful property is not devoted to public service, it should not ask the consumer to pay a return on the excess not used in public service, allowing of course for a reasonable reserve. "The rate may be reasonable, though it fails to produce an investment return of the

legal rate of interest, as where the business has not been developed sufficiently to be remunerative, or the plant has been over-developed to meet the probable future demands of the business: San Diego Land & Town Co. v. Jasper, 189 U. S. 439." Ben Avon Boro. v. Ohio Valley Water Co., 68 Pa. Superior Ct. 576, 577. As to such of the company's physical property produced by the result of human effort there is little difficulty, for the subject-matter may be seen and its use fairly determined. For illustration, we may name artificial gas plants, light, heat and power companies, and other similar utilities.

In ascertaining what part of the value of the gas lands not presently in service should be included in the rate base, we must consider the purpose for which the additional holdings were acquired and the physical characteristics unique to this class of lands. There may be something inherent in the land, its peculiar qualities or the use that differentiates this from other properties. We may assume these properties were acquired for the interest and benefit of the rate-payer as well as the company. Gas is a fugitive substance, it has no fixed situs; when drawn from one well it may come from any part of the territory, as it flows from one well or piece of land to another. When gas escapes to other fields, the former owner's title is lost. As each year's use diminishes the supply, so one part of the tract becomes exhausted, and the entire field related thereto may be exhausted. Gas sometimes lies in a pocket in a known gas field; in this it differs from coal, ore, and other minerals, and is more like oil. There is no means of reproducing the product when once taken from the earth; the company gets only the gas enclosed in the reservoir, and there is no known means of determining the quantity enclosed therein. Like many utilities, its strategic, as distinguished from its monopolistic, position in its chosen field may be an added circumstance, not only as to value but how much should be included in present value. While productivity may be considered, its place is and should be in value, and

the market or present value should and, as we read the evidence, did take in these conditions.  Because of these qualities, while it may be possible to presently determine the value of the lands, in fixing the probable proportionate amount of future life of the entire tract applicable to use, useful and fair reserve, it may be, and no doubt is, impossible to delimit it with any degree of certainty either in acreage or value.  There can be no graduated values of gas lands fixed as a rate base under any theory presented to us that will consider property presently used and a descending ratio until exhaustion appears, that is not the result of a pure guess.  Beyond that proportion of the lands reasonably necessary to the company's life, the rate-payer should not be required to assume the remainder as a burden.  Though this may be difficult to determine, the commission, acting as an administrative body in each case, must decide the question, as in all other matters, subject to the right of appeal.

One thing of importance must not be lost sight of. Whether the gas lands be valued or considered on a reservoir or acreage basis, the gas is not paid for as gas until it is brought to the surface and used; in addition to the fair return on the rate base as found, there is added payment for the corpus of the estate taken away, or gas that is taken out, used and cannot be replaced. This is taken care of in an allowance for "depletion." The fair return on the rate base is a fair return to the company for the money invested.  It does not include any sum to repay capital outlay; it only pays for the use. This must follow, for a reasonable part of the gas holdings not being presently consumed but essential to the future life of the company, the carrying charges with incidentals should be allowed in the rate; we know of no more equitable rule for the amount to be fixed as its rate base,—certainly one fraught with less difficulty than the present value theory adopted by the courts. It applies with equal fairness to the consumer and to the company, for if these lands may be disposed of to oth-

ers at present value, the owner should not be denied compensation on a similar basis. These charges are of the same character as those embodied in what is known as fair return. The consumer not paying for the product until actually removed, is not paying for what someone will later pay. The purpose for which the lands are bought must be fairly essential to the life of the business.

Suppose we adopt the theory of original cost as to these lands, it would be just as incorrect fundamentally as that of present value, for the complaint is against paying any return on the value of what will be used in the future. If, as stated, original cost includes all gas lands, we meet the difficulties mentioned in another part of this opinion, wholly unfair to the owner as well as consumer where that cost is exorbitant. In new fields of unknown duration, suddenly developing a large output, the highly speculative feature of these lands is well known. "The purchase of additional gas rights," treated "as operating charges," places on the present-day consumer an undue burden, particularly when the prices paid are high. It enables the company to recoup immediately its capital outlay. If, in addition, we carry forward the cost as a part of the rate base, or recovery is permitted through depletion, then we allow an additionl return on capital already in the pockets of the owners.

If we give no return on any value for these lands, the owner for a given number of years receives nothing for an investment upon which the life of his and the consumers' organization depends. Not until it is used is he paid, and such payment is based, under the rule, on the then present value. This value will not include compensation disallowed during the years the property stood waiting to be used. Market value is not built on any such consideration. There is no scheme advanced whereby the owner may recover the interest, other outlays, or the return on present value. While some rules as to lands for future use must prevail, its determination is primarily for the commission.

Did the commission give any consideration to going-concern value, fixed by the utility at $1,742,000? The report with respect to this item says: "Taking into consideration all the elements which may and should properly be considered, including a proper deduction for accrued depreciation, we are of opinion and determine that the......property attributable to Pennsylvania has a fair value for rate making purposes of $14,380,000. In reaching this conclusion we have given due consideration to going-concern value. Utilities are entitled to going-concern value where it appears in the evidence: Ben Avon Boro. v. Ohio Valley Water Co., 68 Pa. Superior Ct. 561, 587; S. C. 271 Pa. 346, 354. The commission, in reaching the value attributable to Pennsylvania, specifically found $5,500,000 went to gas holdings, leaving $8,800,000 fair value for all other classifications of rate base. The joint conference of engineers found $12,000,-000 as the latter value. Adding plant additions and working capital, the difference is $4,000,000. No agreement was reached for accrued depreciation on the physical properties. The company conceded ten per cent except as to gas holdings; the municipalities claimed 46 per cent. If going-concern value was included in the figures introduced by the commission, it is difficult to see where it has been placed. The report does not justify itself on this item. The company is entitled to an amount to be determined by the commission.

Lump sum or partial lump sum values are unfair both to the public and the utility where they represent the composite of a number of items entering into it. The commission's findings need not set forth the value of each separate piece of property, but there are standard classifications entering into the rate base recognized in the many decisions of the Supreme Court of the United States, particularly noted in the dissent in the Southwestern Bell Case. With the engineering force and assistance at hand, we see no reason, when facts are presented and determined, why they should not appear

under the different classifications at least with sufficient clarity that the courts may know the parties vitally interested have not been unfairly dealt with. As stated in Monroe Gaslight and Fuel Co. v. Michigan Public Utilities Commission, 292 Fed. 139, which reviews extensively the Southwestern Bell Case, the Bluefield Waterworks and Georgia Power Company Cases: "It will be noted, however, that, pursuant to a common practice, the report seeks to immunize itself against attack by a careful declaration that no one element is given controlling effect in fixing the rate base, but that actual cost, investment, capitalization, reconstruction cost, depreciation, etc., are given, and each is given, due weight in reaching the final composite conclusion. As Mr. Justice BRANDEIS points out, such a report, like the general verdict of a jury, suggests immunity to any attack which depends upon showing that the commission gave excessive or insufficient force to any one element. We do not see that any otherwise appropriate judicial revision can be escaped in this manner. It is the duty of the court to determine the rate base from the evidence before it; and......neither presumption nor express statement by the commission that it has given due weight to every one can prevail against the contrary inference required by the proofs."

The commission should find the rate to be applied for accrued depreciation. While the company's theory may seem logical, in practice it is well known that plant efficiency depreciates each year on a percentage which can be ascertained with fair accuracy. Where there is evidence of going-concern value the report in each instance should show in plain words how much or the total sum which the commission has allowed for such value; and, if it is disallowed, the reasons for such disallowance should be stated.

It is contended by the municipalities that the profits derived from the sale of gasoline should be considered in fixing the rate. For some time the company extracted the gasoline and sold it. Several years ago this business

was taken over by the Pennsylvania Oil Company, a separate corporation, the stock of which is owned by the gas company. A large plant was erected by the oil company; it deals not only in gasoline, but oil generally; no part of this plant's value was included in the rate base in this case. There were no dividends paid, nor were the expenses or costs of operation shown. The Pennsylvania Oil Company paid to the gas company for the privilege of extracting gasoline like any other consumer the domestic rate for all gas passing through the gasoline plant, the residue of gas being returned to the utility. It is not necessary to state in detail why the extraction of gasoline was necessary. If this may be called a by-product of gas, and the company sold the gasoline, we doubt very much whether it could be compelled to account for the profits, being a separate and independent business, not of a public service nature nor within that law. They would be required to account for the rentals or other sums for the use of any of the utility's properties employed in the production of the gasoline; this would include the use of the gas for that purpose. Beyond that it is questionable whether it could be compelled to account for profits in the gasoline business, any more than a water company, having a dam along a stream, operating a grist mill by water power from the same source, selling flour, grain and other products passing through the mill, though paying for the site, would be required to place their profits in the company treasury as a toll against any rate to consumers for the supply of water. On the municipalities' theory, if the profits were large enough to pay the cost of operation, upkeep, and insure a fair return on the entire investment, the consumers of water would be entitled to water free, or all customers might be ratably reduced. It is well to stop within the utility business as it relates to the public and is controlled by the Public Service Law. No dividends were declared; there was no evidence of net profits, and for this reason alone the commission was

clearly right in declining to consider profits from the sale of gasoline in reducing the rate to be fixed for the customers who used gas. But the company is entitled to a fair price for the use of gas to produce the gasoline; it may include other elements of cost than the mere price of gas at domestic rates. Whether the gas company received it is not now before us on this record.

The rate fixed on the output will yield a fair return on the valuation fixed for all the company's property in Pennsylvania. It may change if a different base is adopted. Depletion per cent is an elusive quantity. Like many subjects of such nature, it must be founded on a reasonable theory. We cannot say the one used by the commission was incorrect; it appeals to us as being fair, though the gross sum might vary under this method, with a change in the rate base. We have spoken of depletion in another part of this opinion; unless changed when the report is revised, the commission's finding is sustained. Our analysis of the evidence convinces us that no substantial error was made in computation. The tricounty valuation, while not here specifically mentioned, is covered by the general discussion.

Counsel for the commission deny to the municipalities and individual complainants the right to appeal and the scope of inquiry on such appeal. Inasmuch as they are consumers the right of appeal to the Superior Court cannot be questioned, and as the appeals are here by special allowance their standing is fixed. We need not decide at this time, the scope of the Superior Court's review or the right to appeal if they were not consumers.

The record is remitted to the Superior Court, with directions to send it back to the commission in order that the latter may revise its findings in accord with the views expressed in this opinion, with leave to reopen the case to take further evidence, if advisable.