Marshall, C. J.,
 

 dissenting. As stated in the
 
 *302
 
 majority opinion, this is the third time this cause has been before this court, involving the same identical schedules. Upon the first review this court decided that the same schedules now before the court were not just and reasonable, and the cause was remanded for further proceedings. The schedules involved in this controversy were first published on June '25, 1920, to become effective August 21, 1920.
 

 Counsel for the city of Cincinnati have seen fit to narrow the issues in this review to two fundamental propositions: First, that the valuation of the property used and useful, while an important factor in the establishment of rates, is not the only consideration which should move the Commission; and, second, that a “depreciation or deferred maintenance account,” commonly called a “depreciation reserve,” should not be added to the other capital assets of the utility in determining the value of the property used and useful.
 

 Upon the first of these propositions, the Public Utilities Commission and this court must be governed by the provisions of the General Code. ¡Section 499-8, General Code1, provides that as a part of the proceeding in ascertaining the reasonableness and justness of rates and charges the Commission
 
 may
 
 investigate and ascertain the value of the property of the utility. Subsequent sections, and especially 499'-10, provide that many additional facts
 
 shall
 
 be investigated and ascertained, including the bonded indebtedness, the original capital stock, and moneys received from the issue of such stock, bonds, or other securities. It is incontrovertible, and the majority opinion does not seek
 
 *303
 
 to controvert the proposition, that the valuation of the property used and useful is only one of the circumstances necessary to be considered; that the capital stock, and the moneys received from the sale of such stock, is also a very pertinent subject of inquiry.
 

 All this has. been discussed at length in a concurring opinion in
 
 Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 105 Ohio St., at pages 190 to 198, inclusive, 137 N. E., 37, and will not be discussed at length in this dissenting opinion. It is only necessary to state that the stockholders for the past 15 years have never received less than 8 per cent, on their stock, and for a period of six years received 10 per cent, per annum, and in the year 1918, just prior to the publication of the schedules now being investigated, a dividend of
 
 20y2
 
 per cent, was paid.
 

 It is true that in the findings of the Oommission in this case, by using certain figures as the expression of the value of the property used and useful, and by omitting any mention of the fact that an exorbitant amount is added to the surplus each year under the guise of setting aside a depreciation reserve, it is made to appear that the net earnings available to stockholders are slightly less than 6 per cent, upon the valuation so found.
 

 The “depreciation or deferred maintenance account,” amounting to approximately $5,000,000, has been included to make up the total valuation of $17,233,545. Without the inclusion of this reserve, even though no other changes were made in the mode and manner of the Commission’s calculations, the return would be approximately 8 per cent, upon the property used and useful. The finding of the
 
 *304
 
 Commission and the opinion of the majority of the court in this case clearly illustrate the ease with which figures can be made to produce any desired result.
 

 The first proposition is so closely interwoven with certain elements of the second proposition that we will pass to the second proposition without further comment upon the first.
 

 We again desire to refer to the opinion in 105 Ohio St., on the subject of depreciation reserve, at pages 198 to 206. All that was stated in the opinion at that time is equally pertinent at this time, and after careful study of the principles therein discussed for the past three years, while this case has been pending and while it has been shuttled back and forth, I am still of the opinion that everything therein stated is sound.
 

 It is not necessary to discuss at length at this time the case of
 
 Pollitz
 
 v.
 
 Public Utilities Commission,
 
 97 Ohio St., 191, 119 N. E., 507. A careful study of that case shows that Sections 614-49 and 614-50 were there under consideration and discussed at length in the opinion in that case. An examination of the record on file in that case shows that it was sought by the railroad company to capitalize its. accumulated surplus. The railroad company had not faithfully complied with those sections, and had not kept its depreciation reserve separate from its accumulated surplus account, and this court therefore went to much greater lengths than it is required to do in the instant case and criticized the utility for not keeping its depreciation reserve separate, and declared not only that it was its duty to do so, but, further, that whatever
 
 *305
 
 sum was properly to be credited to a depredation reserve in compliance with those sections would be withdrawn from the capital account and could not be used as a basis for increase of capital stock. That case not only becomes a very pertinent authority, which is in principle on all fours with the instant ease, but it is a much stronger illustration of the soundness of the principles for which we contend than is the case now under consideration. It is significant that no one has ever attempted to answer the reasoning of that case, and certainly no one has been successful in disputing its applicability to the case at bar.
 

 Another case referred to at page 204 of the ease reported in volume 105 is
 
 Railroad Comm. of Louisiana
 
 v.
 
 Cumberland Tel. & Teleg. Co.,
 
 212 U. S., 414, 29 S. Ct., 357, 53 L. Ed., 577. A great deal of space in the majority opinion of this case has been devoted to a discussion of that case, and the briefs of counsel, and the opinions of other courts of inferior jurisdiction predisposed toward liberal rates, have attempted to explain what Judge Peek-ham had in mind when making many of the statements found in the opinion in the
 
 Cumberland case.
 
 It should be remarked that while the language is that of Judge Peckham, the principles declared must necessarily be charged to the entire court, because it was a unanimous opinion, except that it lacked the concurrence of Chief Justice White; he not having heard the argument and therefore not taking any part in the decision of the case. It should be further remarked that it is a distinct affront to the memory of that great jurist, Judge Peckham, to allege at this late date that he said one thing, but
 
 *306
 
 that he meant another. A careful scrutiny of his opinions during the entire period of his service on the supreme bench indicates that there is very little, if any, ambiguity found in his expressions, and there is even less of
 
 obiter dicta.
 
 With this preface let us see what was actually said in the opinion. In the first place, a tribute was paid to the management of the telephone company in that case:
 

 “The evidence in the case shows that the company’s affairs had been economically administered, and that its business had been conducted in the state of Louisiana, ever since its entrance into that state, with great care and economy; that the stock had not been watered; that its capital was contributed in cash and every economy possible had been practiced.”
 

 If there is a case to be found where liberality should be indulged toward the utility, it is such a case as that above described. Treating of the power of the utility to invest the depreciation reserve in extensions and betterments, and to use the- same as a basis for increased rates, the court said, at page 424 (291 iS:. Ct., 362):
 

 “It was obligatory upon the complainant to show that no part of the money raised to pay for depreciation was added to capital, upon which a return was to be made to- stockholders in the way of dividends for the future. It cannot be left to conjecture, but the burden rests with the complainant to show it. It certainly was not proper for the complainant to take the money, or any portion of it, which it received as a result of the rates under which it was operating, and so to use it, or any part of it, as to permit the company to add it to
 
 *307
 
 its capital account, upon which, it was paying dividends to shareholders. If that were allowable, it would be collecting money to pay for depreciation of the property, and, having collected it, to use it in another way, upon which the complainant would obtain a return and distribute it to its stockholders. That it was right to raise, more money to pay for depreciation than was actually disbursed for the particular year there can be no doubt, for a reserve is necessary in any business of this kind, and so it might accumulate,
 
 but to mise more them money enough for the purpose and place the balance to the credit of capital upon which to pay dividends cannot be proper treatment.”
 

 It is an affront to the memory of that great jurist, and it is equally an affront to the intelligence of any reader of that language to insist that it did not declare that the depreciation reserve cannot be capitalized. We cannot quote the entire opinion, because of its length, but it clearly appears throughout the discussion of that branch of the case that the discussion was pertinent to the issues involved.
 

 The majority opinion in the instant case quotes Judge Peckham’s opinion in the
 
 Cumberland case
 
 as follows:
 

 “We are not considering a case where there are surplus earnings after providing for a depreciation fund, and the surplus is invested in extensions and' additions. We can deal with such a case when it arises.”
 

 The majority opinion in the instant case wholly misconceives the meaning of that language. There is no difficulty or mystery about it. Judge Peckham clearly stated that a distinction is to be drawn
 
 *308
 
 between “surplus earnings” and a “depreciation reserve.” The Cincinnati Telephone Company carries both funds. The depreciation reserve is provided for by an arbitrary 5 per cent, deduction, and after making this deduction and paying all operating expenses and dividends there has remained each year for the past 15 years an additional considerable sum of money, which is credited to unappropriated surplus. It is such unappropriated surplus that Judge Peckham has clearly declared not to be included within the ban against capitalizing depreciation reserve.
 

 The majority opinion finds much comfort in the case of
 
 Michigan Public Utilities Commission
 
 v.
 
 Michigan State Telephone Co.,
 
 228 Mich., 658, 200 N. W., 749. This case is a strong authority, but it is certainly not controlling upon this court, in the face of the United States Supreme Court decision in the
 
 Cumberland case.
 
 After having carefully read the opinion of Chief Justice Clark in the
 
 Michigan case,
 
 we are bound to respectfully insist that his comment upon the
 
 Cumberland case
 
 finds no justification. In any event, the statement of facts in that case shows that the actual accrued depreciation was found to be $9,500,000, and the depreciation fund was exactly the same amount. The company was in that case therefore only capitalizing the actual accrued depreciation. It is significant that-the General Code of Ohio specifically requires the deduction of the accrued depreciation. The Michigan decision could not therefore be a sound decision if rendered in this state. The dissenting opinion in that case seems much more logical than the majority opinion.
 

 
 *309
 
 The majority opinion in this case has cited the cases of
 
 City of Minneapolis
 
 v.
 
 Rand
 
 (C. C. A.), 285 F., 818,
 
 Newton, Atty. Gen.,
 
 v.
 
 Consolidated Gas Co.,
 
 258 U. S., 165, 42 S. Ct., 264, 66 L. Ed., 538, and
 
 Erie City
 
 v.
 
 Pub. Service Comm.,
 
 278 Pa., 512, 123 A., 471, to show that past successes do not require that the company operate in the future at a loss. "We can not see how that proposition has anything to do with the instant case. 'Siurely all unbiased conservative persons agree that the past has nothing to do with the matter. We are not insisting in this case that the mere fact that the company has had large earnings in the past, and that it has built up a large surplus, requires that it should now be required to adopt a rate which would offset the excesses of the past. We heartily agree with the authority cited and with the majority opinion on this point, only contending that it has no applicability to the case.
 

 If this were a proceeding where the utility was fighting to prevent a reduction of rates and revenues, there might be some justification for a discussion of above cases. The fact is that for the last 15 years the Cincinnati Telephone Company has steadily increased its unappropriated surplus, its depreciation reserve fund, and during the same period has enormously increased in the value of its property used and useful while at the same time paying to its stockholders dividends averaging approximately 11 per cent, per annum, and at the same time has succeeded in persuading the Utilities Commission to approve a new schedule of rates and charges designed to further increase its surplus and to use such further surplus and enlarge
 
 *310
 
 ments of capital as justification for a higher base rate.
 

 The foregoing is but a momentary diversion from the main question for the purpose of disposing of a few authorities cited in the majority opinion, which in our judgment have no bearing upon the proposition. It will, of course, be readily conceded that
 
 Monroe Gaslight & Fuel Co.
 
 v.
 
 Michigan Public Utilities Commission
 
 (D. C.), 292 F., 139, is also an authority in support of the majority opinion, but it must not be overlooked that this is a District Court opinion, and that it also flies in the face of the Supreme Court decision in the
 
 Cumberland case.
 
 By reference to page 147 of the opinion in the
 
 Monroe Gaslight case
 
 (292 F., 139), we find that depreciation reserve is treated as a mere bookkeeping estimate, and we quote the court as follows:
 

 “It appears in the list of assets only because it represents a supposed loss of capital (or of accumulations) ; and if the capital stock is carried as a liability at par, along with undivided profits and surplus, then the depreciation must appear upon the other side of the account.
 
 If the bookkeeping estimate is accurately made, it will precisely balance the actual difference between the present value of the depreciated items cmd the future cost of proper replacements or substitutions.”
 

 Under the reasoning of the court in that case, the depreciation reserve account could never be more than the accrued depreciation, which in this case is slightly less than 8 per cent., while as a matter of fact the depreciation reserve account has grown to approximately 30 per cent.
 
 We
 
 have
 
 *311
 
 carefully read all of the court’s opinion in the
 
 Monroe Gaslight case,
 
 and we are unable to agree with the reasoning in support thereof. It is stated at page 147 that the idea has become prevalent that the depreciation reserve is a trust fund. We do not make any such contention; but we do insist that a reserve account is all that that term implies, and that it may not be violated by passing it to the surplus account. We have never complained of the size of the reserve fund in the instant case, and we cannot see that it makes any difference how large it grows, so long as it is maintained as a reserve and the fund is not violated by treating it as capital assets. A reserve is for a specific purpose, and that purpose is to provide against worn-out equipment, which has to be replaced, and against unforeseen'casualties. It would seem that ordinary business prudence would dictate that such a fund should be oared for by investment in quick assets in order to be readily available when the equipment must be replaced or the casualty provided for. As illustrating what would be likely to happen — if any great casualty that involved an unforeseen expenditure of $5,000,-000 should overtake the Cincinnati Telephone Company — the company instead of having the $5,000,-000 readily available, would find the $5,000,000 reserve account already invested in permanent equipment, and would therefore be compelled to borrow that amount of money to meet the emergency. Surely no one believes that the interest on such borrowed money would not be charged as an operating expense, thereby again making the candle burn at both ends.
 

 
 *312
 
 We do not deny that this reserve belongs to the utility, and on any distribution of the assets of the company, on dissolution, it would necessarily go to the stockholders. The fact that the company has title to the property does not obviate the essential fact that it was permitted to be taken from the public for a certain purpose and that it is being used for a different purpose.
 

 A careful examination of this- record further shows that the company has pursued a policy of erecting its equipment in a permanent manner, a great portion of which is underground and which requires almost no renewals. The experts who have testified in this case have produced facts and figmres which show that while the company has been arbitrarily setting aside 5 per cent, of its entire depreciable property as a reserve fund, it has been found necessary to expend less than 1 % per cent, per year during the last eight years. The effect of this is to increase the company’s- surplus each year by more- than 3 per cent, of its entire depreciable property, which is in fact approximately 5 per cent, of its outstanding capital stock. By such means the company is able to increase its capital assets very largely each year, all of which is done by extracting what we conceive to be an unlawful revenue from the people; and then, to make the matter worse, employing the surplus thus raised as a basis for even greater rates. The record shows that during the past year more than $680,000 has been added to the depreciation reserve account, which sum would pay approximately a 5 per cent, dividend upon all the outstanding capital stock. That there is a large surplus thus
 
 *313
 
 added each year seems to be admitted by counsel for the utility, because they have incorporated Exhibit No. 2 as a part of their brief in this case, and that exhibit shows that the average amount expended from the depreciation reserve during the past eight years is 1.39 per cent. It is conceded that the Supreme Court of the United States has in a measure approved of the 5 per cent, allowance for depreciation, but this is only as a general proposition, and we find no case whére the court has said that such an allowance should be made arbitrarily in all cases. Experience has shown that utilities generally build in such temporary fashion that it requires approximately 5 per cent, for replacements, and to provide against casualties; but this cannot be true of the Cincinnati Telephone Company, which builds in a more permanent fashion, and where experience has shown that one-third of that amount is sufficient. We do not criticize the company for building thus permanently, but we think it has been sufficiently rewarded when the expensive construction is appraised at the full value of its cost and a rate is allowed which permits a fair return upon that cost.
 

 The fact that the Cincinnati Telephone Company has grown stronger financially, and that this growth has been by leaps and bounds during the past eight years, much the greater portion of which growth has been financed out of profits, is not at all conclusive of this inquiry, but it is ■ at least significant, and for the benefit of those who
 
 *314
 
 have not studied the situation, the following table is given:
 

 The foregoing table also clearly indicates the injustice to the public of .permitting an arbitrary allowance of 5 per cent, for depreciation reserve when only 1.39 per cent, was required to meet the actual cost of renewals. It should be stated in fairness that the growth in the value of plant and equipment has not all been financed out of profits; but, during the past three years, when the largest growth has taken place, and this being the period which the majority opinion finds has justified the increased rates and revenues, the records show that only $2,298,600 was subscribed to the capital stock and nearly $3,000,000 of the growth during the past three years is surplus revenues over and above the 8 per cent, dividend paid to stockholders.
 

 It should further be added at this time, as a reason why telephone companies are not fairly
 
 *315
 
 entitled to such profits as have been earned by the Cincinnati Telephone Company, that by two decisions of this court, both of which were rendered by a bare majority of the court, telephone companies have been given a monopoly in the state of Ohio:
 
 Celina & Mercer County Telephone Co.
 
 v.
 
 Union-Center Mutual Telephone Ass’n.,
 
 102 Ohio St., 487, 133 N. E., 540;
 
 Local Telephone Co.
 
 v.
 
 Cranberry Mutual Telephone Co.,
 
 102 Ohio St., 524, 133 N. E., 527. One of the reasons urged by counsel for the telephone company in the instant case, in favor of the increased rates, is the necessity for attracting capital. We suggest that there should be no difficulty on that score so far as the Cincinnati Telephone Company is concerned.
 

 We must again call attention to a subject which was discussed in
 
 Cincinnati
 
 v.
 
 Public Utilities Commission,
 
 105 Ohio St., at pages 198 to 206, 137 N. E., 36, and feel that we must again call special attention to the fact that this case should be decided upon the statutes of Ohio, which provide that although a depreciation reserve may be invested in betterments and extensions the income upon such investment must be turned back into the depreciation reserve account.
 

 The recent session of the General Assembly of Ohio appropriated a fund of $100',000 to make an investigation of telephone rates and charges. It is apparent that in the face of the majority opinion in this case it would be of no use to expend a penny of that fund in investigations. This record clearly shows that the company has been rapidly growing, not through the investment of additional capital alone, but largely through its accumulated
 
 *316
 
 surplus, and its depreciation reserve, both of which are permitted to be capitalized. No investigation could more clearly show that which appears clearly in this record. The remedy, if one is needed, must be found in the declaration of more salutary principles of law, rather than in the presentation of additional facts and figures.
 

 A part of the majority opinion is devoted to a justification of the contract with the American Telephone & Telegraph Company, whereby 4% per cent, of the gross revenues are paid to that company for the use of certain patents and equipment. We regret that that matter has been discussed in the majority opinion, because it is clearly not involved in the case. The city solicitor has particularly eliminated that question from the case. However, since it is discussed in the majority opinion, it cannot be permitted to go unchallenged. That portion of the equipment which is rented from the American Telephone & Telegraph Company represents less than 3 per cent, of the entire investment of the telephone company, and it would seem, therefore, that unless there are special circumstances justifying a larger payment by the Cincinnati Company to the American Company, 3 per cent, of the net revenue of the utility would be a fair return upon that portion of the property rented, which amount for the year 1923 would have been less than $20,000. As a matter of fact, the Cincinnati Telephone Company paid the American Company 4% per cent, of the gross revenue, which amounted to approximately $140,000. We do not contend that $20,000 is all that would have been proper, but we certainly contend that $140,000 was
 
 *317
 
 grossly exorbitant and unjustifiable from any standpoint. Tbe American Telephone & Telegraph Company is engaged in the public service in the same manner as the Cincinnati Telephone Company, and contracts between utilities should be subject to regulation in the same manner and to the same extent as contracts between utilities and the public.
 

 There is another reason why the contract with the American Company should be carefully scrutinized, and that is that the public records show that that company owns approximately 40 per cent, of the capital stock of the Cincinnati Telephone Company. It is equally well known, and provable by public records, that the American Telephone & Telegraph Company owns a large percentage of the capital stock of all telephone companies throughout the United States, and that it owns a majority of the capital stock of a great many telephone companies.