## MICHIGAN PUBLIC UTILITIES COMMISSION *v.* MICHIGAN STATE TELEPHONE CO.

1. MANDAMUS — JURISDICTION — TELEGRAPHS AND TELEPHONES — RATES—PUBLIC UTILITY.

   The State Supreme Court has jurisdiction to review by mandamus, at the instance of the public utilities commission, orders of the commission reducing the rates to be charged the public by a telephone company, where no question of jurisdiction was raised by counsel, and a stay of proceedings under said orders was granted pending the final determination in this proceeding, in conformity with section 266 of the judicial code of the United States (37 U. S. Stat. p. 1013), notwithstanding 2 Comp. Laws 1915, § 6702, providing for such review in a court of chancery.[1]

2. TELEGRAPHS AND TELEPHONES—RATES LESS THAN JUST CONFLICT WITH FEDERAL CONSTITUTION—CONFISCATION.

   A State enactment or regulation made under the authority of the State establishing rates for telephone service that will not admit of the telephone company earning such compensation as, under all the circumstances, is just to it and to the public, would deprive the company of its property without due process of law and deny to it the equal protection of the laws in violation of the 14th Amendment to the Constitution of the United States.[2]

3. SAME—WHETHER RATES CONFISCATORY SUBJECT TO JUDICIAL INQUIRY.

   Whether rates established by the public utilities commission to be charged the public for telephone service by a telephone company are so low as to deprive it of its property without just compensation in violation of the 14th Amendment to the Constitution of the United States, is subject to judicial inquiry.[3]

4. SAME—ELEMENTS ENTERING INTO JUST RATE—PUBLIC UTILITIES.

   The chief elements of just compensation to defendant

---

[1]Courts, 15 C. J. § 505; [2]Telegraphs and Telephones, 37 Cyc. p. 1632; [3]Id., 37 Cyc. p. 1632 (1926 Anno).

For authorities discussing the question of rate of return to which telephone company is entitled, see note in 31 A. L. R. 825.

telephone company are: (a) Operating expense, including administration, labor, interest, taxes, certain items of repair and maintenance; (b) depreciation, physical and functional, including wear and tear of property by use, the constant destruction of property by earth's relentless processes, and supersession and obsolescence of machines and structures by progress; (c) a fair return upon the present fair value of the property used and useful in public service.[4]

5. SAME—WHETHER RATES CONFISCATORY A FEDERAL QUESTION—FEDERAL DECISIONS CONTROLLING.

Since the question as to whether rates fixed by a State regulation of a public utility are so low as to amount to confiscation is a Federal question, the decisions of the United States Supreme Court thereon are controlling.[5]

6. SAME — RATES — DEPRECIATION SHOULD BE SPREAD OVER THE YEARS.

The public utilities commission, in fixing the rates to be charged the public for telephone service by a telephone company, should spread the amount of the depreciation, less salvage, over the years and make an annual allowance in earnings that will be fair to the public and that will fairly compensate the company for the property consumed in service; said fund to be definitely the property of the company.[6]

7. SAME—RATE BASE IS PRESENT FAIR VALUE.

That the rate base is present fair value is settled by the decisions in *Smyth* v. *Ames*, 169 U. S. 466, and in the *Minnesota Rate Cases*, 230 U. S. 352.[7]

8. SAME—AMOUNT SET ASIDE FOR DEPRECIATION SHOULD NOT BE DEDUCTED FROM PRESENT FAIR VALUE.

The reserve fund set aside for depreciation is the property of the company, and where invested, it had the right to earn upon it, and, therefore, it should not be deducted from the value of the company's property in arriving at the present fair value in fixing the rate base.[8]

[4]Telegraphs and Telephones, 37 Cyc. p. 1632; [5]Courts, 15 C. J. § 318; [6]Telegraphs and Telephones, 37 Cyc. p. 1632; [7]Id., 37 Cyc. p. 1632; [8]Id., 37 Cyc. p. 1632.

9. SAME—PUBLIC UTILITIES COMMISSION WITHOUT AUTHORITY TO
REDUCE AMOUNT PAID ON CONTRACT BY PUBLIC UTILITY FOR PUR-
POSE OF LOWERING RATES.

   Where defendant telephone company had contracted with
   another company of which it is a subsidiary, to pay it
   4½ per cent. of its gross revenues in return for the rental
   of telephones and other services rendered, the public
   utilities commission had no authority, in orders fixing the
   rates to be charged by defendant, to order a substantial
   reduction in the amount so paid by defendant; said con-
   tract having been sustained by both the State Supreme
   Court and the United States Supreme Court.[9]

10. SAME—RATE OF DEPRECIATION.

   In the light of the facts in this case, the act of the public
   utilities commission in fixing the rate of depreciation
   at 4 per cent. of the total of fair value, less land and
   right of way, while low, *held*, not confiscatory.[10]

11. SAME—VALUATION OF PHYSICAL PROPERTY.

   Considering all of the evidence and the elements entering
   into a judgment of fair value, a valuation of the physical
   property of defendant company at the sum of $47,500,000,
   exclusive of working capital, *held*, not open to the ob-
   jection that it is confiscatory.[11]

12. SAME—ALLOWANCE FOR GOING VALUE SHOULD BE MADE.

   The defendant company is entitled to allowance for going
   value, and the amount thereof should be determined fairly
   by the public utilities commission from the facts, includ-
   ing the financial history of defendant.[12]

13. SAME—FRANCHISE CONTRACTS IN CERTAIN CITIES AFFECTED BY
ORDER OF PUBLIC UTILITIES COMMISSION.

   That an order of the public utilities commission is ap-
   plicable to franchise contract rates in the cities of St.
   Joseph and Benton Harbor, is settled by the authorities
   and statutes reviewed in the opinion of the commission.[13]
   McDONALD, BIRD, and WIEST, JJ., dissenting.

Mandamus by the Michigan public utilities commis-
sion to compel the Michigan State Telephone Company

---

[9]Telegraphs and Telephones, 37 Cyc. p. 1630; [10]Id., 37 Cyc. p.
1632; [11]Id., 37 Cyc. p. 1632; [12]Id., 37 Cyc. p. 1632; [13]Id., 37 Cyc
p. 1630.

to comply with the terms of an order respecting rates. Submitted June 18, 1924.    (Calendar No. 30,520.) Writ denied October 30, 1924.

*Andrew B. Dougherty,* Attorney General, *Clare Retan,* Deputy Attorney General (*Ernest C. Smith* and *William W. Potter,* of counsel), for plaintiff.

*Stevenson, Carpenter, Butzel & Backus* (*Thomas G. Long* and *James O. Murfin,* of counsel), for defendant.

*Richard I. Lawson* and *George A. Kelly,* Corporation Counsel (*David H. Crowley,* of counsel), for city of Detroit.

*John H. Farley,* Flint, *Ganson Taggart,* Grand Rapids, *Marvin J. Schaberg,* Kalamazoo, *John W. Patchin,* Traverse City, *Arthur J. Butler,* Big Rapids, *Roscoe O. Bonisteel,* Ann Arbor, *John A. Wagner,* Battle Creek, *Goodloe H. Rogers,* Pontiac, *J. L. McCormick,* Bay City, *Thomas J. Riley,* Escanaba, *M. Grove Hatch* and *Leland S. Bisbee,* Jackson, *A. P. Cady,* Benton Harbor, *B. H. Halstead,* Petoskey, and *Elijah B. Howarth, Jr.,* Royal Oak, City Attorneys for said cities.

CLARK, C. J.    Plaintiff, Michigan public utilities commission, made, in July, 1922, an order to establish rates of defendant, Michigan State Telephone Company.    An amendment making the order more specifically applicable to Detroit was made later.    Defendant refused to obey the order.    It filed a bill in the United States district court at Detroit.    An interlocutory injunction issued.    To compel obedience plaintiff instituted mandamus in the circuit court for Ingham county.    Counsel agreed that plaintiff might apply to this court for an order requiring defendant

to show cause why it should not comply with the commission's order, and that, if an order issued, proceedings in other courts would be stayed, the cause speedily brought to hearing here, and the whole matter submitted for decision. Plaintiff applied. The order issued September 5, 1922. Defendant answered:

"That the orders are wholly null and void and of no force and merit whatsoever in that the rates prescribed therein are less than just and reasonable rates, and also are confiscatory of defendant's property used and useful in the furnishing to the public of the telephone service  *  *  *  and said orders therefore seek to deprive the defendant of its property without due process of law and deny defendant the equal protection of the laws in violation of its rights under the Fourteenth Amendment to the Constitution of the United States."

Reference was made to Hon. Guy M. Chester as special commissioner. After numerous sittings of the commissioner, filing of many briefs, argument, and the report of the commissioner, counsel finally brought the cause to hearing in our June, 1924, term. We have a record of over 3,000 pages, a 70 page opinion of the commission, an 80 page report of the special commissioner, and many briefs filed in behalf of the parties, the city of Detroit, and 14 other cities of the State.

That this opinion may be kept within bounds, only those facts which are important and essential to the questions considered will be stated, and they will be stated generally. See *Lincoln Gas & Electric Light Co.* v. *City of Lincoln*, 250 U. S. 256 (39 Sup. Ct. 454).

1. Jurisdiction of this Court. Mr. Justice BIRD, to whom this case was assigned, has declined to consider the merits, stating that plaintiff must be turned out of court on this question. With his conclusion

we do not agree. Counsel raise no question of jurisdiction. They concede it. It was invoked by plaintiff, whose petition for the writ of mandamus concludes:

"This petitioner prays further that this court immediately issue an order staying all proceedings under the said orders heretofore made by this petitioner and all actions for the enforcement of penalties for a violation of the same pending and until the final determination of this proceeding in this in the manner provided by section 266 of the judicial code of the United States (37 U. S. Stat. p. 1013)."

No question is raised that the said section is applicable, nor that this is a proper suit in a proper State court, timely brought, requiring under the said section stay of proceedings in the Federal court pending final determination of the cause here. It is our duty to dispose of the case on the merits. See *Rapid Railway Co.* v. *Utilities Commission,* 225 Mich. 425; *Prendergast* v. *Telephone Co.,* 262 U. S. 43 (43 Sup. Ct. 466); *Monroe Gaslight & Fuel Co.* v. *Utilities Commission,* 292 Fed. 139.

2. Principles. Language used in a railroad case (*Smyth* v. *Ames,* 169 U. S. 466, 526 [18 Sup. Ct. 418]) is applicable here:

"A State enactment, or regulations made under the authority of a State enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the Fourteenth Amendment of the Constitution of the United States.

"While rates for the transportation of persons and property within the limits of a State are primarily for its determination, the question whether they are

so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, cannot be so conclusively determined by the legislature of the State or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry."

What are the chief elements of just compensation to defendant?

(a) Operating expense, including administration, labor, interest, taxes, certain items of repair and maintenance and the like.

(b) Depreciation, physical and functional, including wear and tear of property by use, the constant destruction of property by earth's relentless processes, and supersession and obsolescence of machines and structures by progress.

(c) A fair return upon the present fair value of the property used and useful in public service.

These elements, when determined, measure the rate to be paid by the public for the service. Upon the issue of confiscation, a Federal question, decisions of the Supreme Court of the United States are controlling.

3. Depreciation Charge. As has been stated, before coming to the question of profit, the company is entitled to earn enough to meet the continuous depreciation of its plant and equipment, and this beyond ordinary current repairs and maintenance. To provide funds from earnings to off-set this depreciation is a right and a duty of the directors of the company. *City of Knoxville* v. *Water Co.*, 212 U. S. 1 (29 Sup. Ct. 148). But the property is made up of many parts of varying lengths of life and of varying rates of depreciation. And progress, new invention, new design, new thought, constantly menace present day machines and structures. A machine functioning ef-

ficiently today may be obsolete and inefficient tomorrow. The rate of depreciation changes with the age of the plant. Telephone lines are in danger of disaster from sleet and storm.

It is the difficult task of the commission to spread the amount of the depreciation, less salvage, over the years and make an annual allowance in earnings that will be fair to the public and that will fairly compensate the company for the property consumed in service. The particulars of this difficulty are fully set forth in Saliers on Depreciation, p. 131, and in opinion of Mr. Justice Brandeis in *Pacific Gas & Electric Co.* v. *City and County of San Francisco,* 265 U. S. 403 (44 Sup. Ct. 537).

Respecting theory, purpose and method of accumulating a depreciation fund, there is a wide difference of opinion. See Hayes on Public Utilities, chap. 9; Saliers on Depreciation, chap. 7. Some hold that the fund belongs to the public. Others say that it is a trust fund, or *quasi*-trust fund, belonging to both the public and the utility to be used for the replacement of invested property when the property is theoretically dead. But the fund is definitely the property of the utility. *People, ex rel. Pennsylvania Gas Co.,* v. *Public Service Commission,* 204 App. Div. 73 (198 N. Y. Supp. 193).

Some contend that the proper basis for valuation is prudent investment cost. See dissenting opinion of Mr. Justice Brandeis, *Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 U. S. 276 (43 Sup. Ct. 544); Goddard on Fair Value of Public Utilities, 22 Mich. Law Rev. 777. But it is settled that the rate base is present fair value as defined in *Smyth* v. *Ames, supra,* and in the *Minnesota Rate Cases,* 230 U. S. 352 (33 Sup. Ct. 729, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18). Computing depreciation

(although perhaps convenient to accountants and bookkeepers), on investment cost, or book cost, as distinguished from present fair value, must be rejected. If the rate base is present fair value, then the depreciation base as to depreciable property is the same thing. There is no principle to sustain a holding that a utility may earn on the present fair value of its property devoted to public service, but that it must accept and the public must pay depreciation on book cost or investment cost regardless of present fair value. We repeat, the purpose of permitting a depreciation charge is to compensate the utility for property consumed in service, and the duty of the commission, guided by experience in rate making, is to spread this charge fairly over the years of the life of the property. The commission found the present fair value of defendant's property used and useful in service to be $47,500,000. There was necessarily involved in this finding all proper deduction for deterioration and depreciation and the commission so states. The total of depreciation, physical and functional, was found to be $9,500,000. The total of depreciation charge was also found to be $9,500,000, so that the total depreciation fund equaled the existing depreciation. The business of the company had grown. The plant, repaired and maintained, was efficient, rendering satisfactory service. The depreciation fund had been expended for extensions and betterments, for property the present fair value of which was included in the $47,500,000. The commission deducted the $9,500,000 depreciation fund, so invested, from the depreciated value of the property, $47,500,000, leaving $38,000,000, to which it added $1,500,000 for working capital, making the rate base $39,500,000. The commission did not determine present fair value on book value alone. With vehement criticism of the de-

cisions, it professes to have followed *Smyth* v. *Ames, supra,* and other decisions of the United States Supreme Court, herein cited.   It was not to deduct book figures of depreciation from book figures of investment.   It says:

"If the reserve for depreciation is deposited in banks, the company might get 4 per cent. interest thereon.   If it borrows money for capital purposes, it must pay 6 per cent. for it.   The intelligent at once ask why the company should deposit its depreciation reserve of approximately $10,000,000 in banks and receive but 4 per cent. interest, and at the same time borrow a like sum and pay 6 per cent. interest therefor.   Why not use the money yielding but 4 per cent. in place of that which costs the company 6 per cent.? The reserve for depreciation may be used for capital purposes but it is none the less depreciation reserve. If the $10,000,000 was borrowed and used for capital purposes at 6 per cent. interest, the company would be entitled to earn at least 6 per cent. on it, because it cost that to get it.   If the $10,000,000 of depreciation reserve is invested for capital purposes, the company has the use of it for such purposes without its stockholders making any capital contribution thereto.   It costs the company nothing to get this $10,000,000.   It is derived from rates paid by subscribers and users of its service; and, not having been obtained by capital contributions from stockholders, but from the public through earnings or revenues, the public ought not to be charged rates to pay a return to the company upon that which they themselves have contributed.

"The accrued depreciation reserve paid by the public and reinvested in plant or property should not be made the basis of return to the stockholders.   The total present value of the company's property should be decreased in the proportion which such reserve for depreciation bears to the total investment of the company, to ascertain the basis of return to the stockholders."

We think this erroneous.   For the $9,500,000 of

depreciation charge, the company lost $9,500,000 of its property, consumed in service.    How can it be said that it cost the company nothing to get it?    The amount received but compensated for the loss.    The fund was the property of the company and so invested it had the right to earn on it.    Reliance is placed on language used in *Louisiana Railroad Commission* v. *Telegraph Co.*, 212 U. S. 414 (29 Sup. Ct. 357).    The holding there might apply to a case where there was no deduction of depreciation in fixing the rate base, which method finds some support among writers, and in such a case it might not be proper treatment to permit a return on both the undepreciated value of the property and a depreciation reserve.    Our examination leads us to think that Mr. Justice Peckham was there considering such a case. For a discussion of this case, see Whitten on Valuation of Public Service Corporations, 316, and see same author's review of cases in chapters 18 and 20, same volume, and his supplement of 1914, chapter 18.    It is said in Saliers on Depreciation, p. 418:

"It has been stated that the reserve is the property of the public and therefore should not be permitted to earn a return.    This is erroneous.    The amount reserved is definitely the property of the company returned through the rates to off-set accrued depreciation on plant but which has not been deducted from cost.    If the accrued depreciation were deducted from cost of plant in determining fair value then, on the contrary, extensions financed out of depreciation reserves ought to be included in fair value."

See, also, *People* v. *Public Service Commission, supra; City of Charleston* v. *Public Service Commission*, 95 W. Va. 91 (120 S. E. 398) ; and see *Monroe Gaslight & Fuel Co.* v. *Utilities Commission*, 292 Fed. 139, decided June 9, 1923, by Judges Denison, Tuttle, and Simons, who held that the commission has no right

to deduct the amount of depreciation reserve, so invested, from present fair value in fixing the rate base.

The following from *New York Telephone Co.* v. *Prendergast,* 300 Fed. 822, decided July 26, 1924, United States district court, southern district of New York:

"These accumulated charges (depreciation reserve) are not a separate fund.   The total bears no definite relation to the actual condition of the property; for one item may have been, and was charged years ago against the cost of an article scrapped long since, while another was charged yesterday against one just entering upon its life of usefulness.   In fact, the depreciation reserve is a piece of bookkeeping, a monthly charge against earnings, to provide means, not only of covering deterioration from use and time, but of minimizing, and only minimizing, future possible losses of any kind, from storm or fire to changes of fashion.   The funds or credits thus reserved are, and always have been, expended in strengthening the company's useful property, but what particular property it is neither possible nor useful to ascertain.   *   *   *
"To deduct from the fair value of plaintiff's property the entire book reserve for depreciation, in order to reach a rate-base, was error of law."

Counsel for defendant make the following pertinent suggestions:

"If the company should sell its entire property, this part (invested reserve) would be conveyed along with the rest.   If the property of the new owner should be valued in a rate case would some part of the fair value of the property found upon an appraisal be deducted because of the depreciation accounting of the former owner?   Would the books or accounts of the former owner have any bearing upon a fair value of the property?   Would not the fair value of the property be the same if the books were destroyed? If that is so, is not the fair value of the property in the hands of the present owner the same, regardless of the books?   If the company were mortgaging the

property would it mortgage the whole?    Can there be any doubt about its right to mortgage all the property to which it has the title regardless of where it got the money to pay for it?    If the property were mortgaged and the bondholders should foreclose, would they foreclose upon less than the whole?"

The correction respecting the depreciation fund will, for the purposes of this opinion, increase the rate base from $39,500,000 to $49,000,000, including working capital.    This necessitates a denial of the writ.    But other questions must be discussed.

4. Complaint of the rate of return, fixed by the commission at 7 per cent., and of the allowance for working capital, $1,500,000, is not pressed and will be passed.

5. 4½% Contract.    Between the American Telephone & Telegraph Company and subsidiary companies, of which defendant is one, exists a contract by which defendant is required to pay and has paid 4½% of gross revenues in return for rental of telephones, and other services sufficiently set forth by this court in *City of Detroit* v. *Michigan Railroad Commission*, 209 Mich. 395, and in which this contract was sustained.    Doubtless a contract made between these companies, the major company owning nearly all of the stock of the defendant, should be scrutinized closely, and this rule is recognized by the courts.

The commission ordered a very substantial reduction in the amount to be paid under the contract.    Subsequently the contract was considered by the Supreme Court of the United States in *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra*, decided May 21, 1923, and sustained, the court saying:

"The important item of expense disallowed by the commission—$174,048.60—is 55% of the 4½% of gross revenue paid by plaintiff in error to the American Telephone & Telegraph Company as rents for re-

ceivers, transmitters, induction coils, etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one-half per cent. is the ordinary charge paid voluntarily by local companies of the general system. There is nothing to indicate bad faith. So far as appears, plaintiff in error's board of directors has exercised a proper discretion about this matter requiring business judgment. It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership. The applicable general rule is well expressed in *State Public Utilities Commission, ex rel. Springfield,* v. *Springfield Gas & Electric Co.,* 291 Ill. 209, 234 (125 N. E. 891):

> " 'The commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses unless there is an abuse of discretion in that regard by the corporate officers.'

"See *Interstate Commerce Commission* v. *Railway Co.,* 209 U. S. 108 (28 Sup. Ct. 493); *Chicago, etc., R. Co.* v. *Wisconsin,* 238 U. S. 491 (35 Sup. Ct. 869); *People, ex rel. Delaware & Hudson Co.,* v. *Stevens,* 197 N. Y. 1 (90 N. E. 60)."

The contract was also sustained in *City of Houston* v. *Telephone Co.,* 259 U. S. 318 (42 Sup. Ct. 486), decided May 29, 1922.

It is now contended by plaintiff that the record in the case at bar as to material facts is so substantially different from the record in our own case just above cited and the records in the two cases above cited from the United States Reports as to warrant a contrary holding. After a careful examination of the records and briefs in all the cases, we conclude that plaintiff's contention cannot be sustained. The cases cited are

decisive of the question presented.    The order in this respect is erroneous.

6. Depreciation.    The commission fixed the rate of depreciation at 4% to be computed on the total of fair value less land and right of way (the depreciation fund was not deducted from the base for depreciation).    Defendant complains of this and cites a long list of cases in which a higher rate was fixed.    Our examination of cases indicates a diversity of holding on the subject, part of the diversity is due to difference of opinion, part to difference in facts considered. Probably in a majority of the cases a higher rate has been sustained.    But this is a question of fact depending largely upon the character, nature and age of the property in question, and illuminated somewhat by the experience of the company respecting the subject.    And it must not be overlooked that, as the cases show, many minor replacements, and repairs and maintenance are made and charged to operating expense.    In practice, this contributes considerably toward keeping the property intact.    The commission in its opinion (which see) reviews the question at length and states fully the experience of the company respecting the rate of depreciation and the accumulation of the fund.    The rate fixed is comparatively low, but, in the light of the facts of this case, we must decline to hold it confiscatory.

7. Fair Value.    The rules and elements for consideration in determining fair value are so well known to those interested in the question that we shall not quote from the cases.

See *Smyth* v. *Ames, supra; Minnesota Rate Cases, supra; Darnell* v. *Edwards,* 244 U. S. 564 (37 Sup. Ct. 701) ; *San Diego Land Co.* v. *National City,* 174 U. S. 739 (19 Sup. Ct. 804) ; *Detroit, etc., R. Co.* v. *Railroad Commission,* 171 Mich. 335; *Southwestern*

*Bell Telephone Co.* v. *Public Service Commission, supra; Bluefield Water Works & Improvement Co.* v. *Public Service Commission,* 262 U. S. 679 (43 Sup. Ct. 675) ; *Georgia Railway & Power Co.* v. *Railroad Commission,* 262 U. S. 625 (43 Sup. Ct. 680) ; *Brooklyn Borough Gas Co.* v. *Public Service Commission,* P. U. R. 1918F, 335, opinion by former Chief Justice Charles E. Hughes.

The company was organized in 1904 and took over, from the purchaser at foreclosure sale, the property of a former telephone organization. As to what should be held to be the actual book cost to defendant of this property there is conflict of opinion, due to detail and method of purchase and of financing to purchase. We find the then cost in fact to be $6,740,026. The net additions since that time are $41,305,402, so the book cost is $48,045,428, the funds having been provided by capital contribution and reserve or earnings invested. The total of outstanding stock securities and indebtedness on December 31, 1921, was $41,703,732. The assessed value of the property for taxation fixed by the State board of assessors in 1921 was $27,500,000. Appraisals and computations were made to show cost as at December 31, 1920, of reproduction new on average prices of a 10-year period, 1910-1919, of a 5-year period, 1915-1919, and of the year 1919. To these were added the net subsequent additions for 1921, adjusted to the average price of the particular period. The computations allow for observed physical deterioration only as distinguished from full depreciation found by the commission as stated. The special commissioner, correcting certain arithmetical errors, states that:

"The following figures show how these values are to be derived and the correct figures therefor:

228—Mich.—43.

|  | 10 Year | 5 Year | 1 Year | 1 Year Dep. |
|---|---|---|---|---|
| Michigan Exchanges. | $15,534,746 | $17,395,426 | $22,902,806 | $19,590,641 |
| Toll .............. | 9,590,750 | 10,584,251 | 13,098,455 | 10,567,424 |
| Total .......... | $25,125,496 | $27,979,677 | $36,001,261 | $30,158,065 |
| Wisconsin Exchange. | 25,650 | 28,187 | 36,551 | 27,178 |
|  | $25,151,146 | $28,007,864 | $36,037,812 | $30,185,243 |
| Common Use....... | $2,107,780 | $2,499,783 | $2,997,469 | $2,943,340 |
| Detroit ........... | $22,167,506 | $27,099,263 | $35,088,257 | $32,948,035 |
| Total ............. | $49,426,432 | $57,606,910 | $74,123,538 | $66,076,618 |

Per cent. condition on basis of last two figures, 89.14; observed depreciation, 10.86 per cent.

"To the appraisal costs of December 31, 1920, the additions during 1921 must now be added.

"At the top of page 33 of the commissioner's opinion are given the actual additions of $4,314,155 * * * and conversion of these by composite index figures to five- and ten-year average. The index figure is .8081 for 5-year and .6668 for 10-year as referred to one year. These are added to the preceding totals with the following results:

| Total | 10 Year | 5 Year | 1 Year | 1 Year Dep. |
|---|---|---|---|---|
| Dec. 31, 1920 | $49,426,432 | $57,606,910 | $74,123,538 | $66,076,618 |
| Add 1921.... | 2,876,624 | 3,486,234 | 4,314,155 | 4,314,155 |
| Total .. | $52,303,056 | $61,093,144 | $78,454,693 (A) | $70,390,773 (B) |

"These figures replace those entitled 1-d to 4-d on page 35 of the commission's opinion and the

> 10-year average, $52,303,056
> 5-year average, 61,093,144
> 1-year average, 78,454,693

are the figures under the designation Appraised Value, One Year Period, etc.

"Under 1-c and 2-c, page 35 of the commission's opinion, the condition per cent. found to exist between 3-d and 4-d (now A and B in preceding tabulation),

is applied to the five- and ten-year averages with the following results:

"B divided by A is 89.7%.    This applied to the other cost gives:

> Ten-year average depreciation...........$46,915,841
> Five-year average depreciation........... 54,800,550
> One-year average depreciation............ 70,390,773

"This is the depreciated value for each above periods.    These are also corrected figures for items 1-e, 2-e and 4-4 of page 35 of the commission's opinion."

We think his finding and computation as to this evidence of value to be substantially correct.    Fair value, $47,500,000, added to full depreciation as found by the commission, $9,500,000, gives $57,000,000 as the undepreciated value of the physical property, which figure is about midway between undepreciated value on the 10-year basis, of which basis favorable comment is made by plaintiff, and undepreciated value of the 5-year basis, which basis is urged by defendant.    We quote further from the report respecting additions to plant and equipment during recent years:

"The net additions during the years:

> 1915,    $462,539.01
> 1916,    2,104,262.76
> 1917,    3,240,098.71
> 1918,    3,420,272.39
> 1919,    6,248,723.64
> 1920,    5,439,672.42
> 1921,    4,314,155.04
>
> Total, $25,229,723.97

"During the years 1915 to 1921 inclusive there was added to the plant $25,229,723.97.    This was during the period affected by war prices.    In other words, the plant was doubled in cost expenditures during that period.    *    *    *

"From before 1914 to the middle of 1915, a comparative normal or usual level of prices was 100 or 100%. At the close of 1915 it was 120; during 1916, 120 to 145 and 175; during 1917, 145 to 225; during 1918, 165 to 235; during 1919, 230, then down to 185, then up to 245; during 1920, 220 to 275; during 1921, 150; lower since that."

The above is said to be of general commodity prices. Defendant insists that the curves of prices for particular items in question are as follows:

"Taking 1915 as 100, 1916 is 125, 1917 is 158, 1918 is 192, 1919 is 210, 1920 is 239, 1921 is 204 and the average for the five years, 1915 to 1919 is 157. If the average had been determined for the seven years, 1915 to 1921, the average would have been higher."

It may be noted that while it is assumed in this case that the 1914 price level was about normal, it is said to have been 50% above the 1897 level. See note, *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* at page 303, where there is a discussion of probable future decline in price levels. The commission also had before it prophecy as to future prices. Some comment is made of nonproductive exchanges, particularly, and of type of equipment, station losses and competitive exchanges, which might call for discussion, but, as they do not affect the result here reached, and, we think, may not arise again, we pass them without discussion.

Considering all the evidence before us, the elements entering into a judgment of fair value (*Smyth* v. *Ames, supra*), according to each element due weight (*Georgia Railway & Power Co.* v. *Railroad Commission, supra*), without slavish adherence to reproduction cost new (*Minnesota Rate Cases, supra*), noting the trend of prices (*Newton* v. *Consolidated Gas Co.,* 258 U. S. 165 [42 Sup. Ct. 264]), and probable future costs

(*Southwestern Bell Telephone Co.* v. *Public Service Commission, supra*), recalling that a large part of this property was acquired during the war period and at very high prices, we must decline to hold that a valuation of the physical property of the company at the sum of $47,500,000, exclusive of working capital, will work confiscation.

8. Going Value.

"That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right and should be considered in determining the value of the property, upon which the owner has a right to make a fair return, when the same is privately owned, although dedicated to public use." *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153 (35 Sup. Ct. 811).

And see *Adams Express Co.* v. *Ohio State Auditor,* 166 U. S. 185 (17 Sup. Ct. 604), and *City and County of Denver* v. *Denver Union Water Co.,* 246 U. S. 178 (38 Sup. Ct. 278).

The commission made no finding of any amount for going value, stating that the subject had been given such consideration as it was entitled to receive. As we read the opinion of the commission, the consideration given was a denial of anything for going value for the reason that the cost of attaching business had been paid out of earnings. The special commissioner reported:

"Unless defendant by clear and convincing proof has shown that the expense of attaching business has not been paid in the overhead expenses or otherwise by the public, or, if not so paid, then that the commission has not taken it into consideration in fixing the rate base of fair value of property, the finding of the commission on going concern value must stand. The commission did consider it, and found it had been paid by the public in the operating expense."

Assuming that the cost of attaching business has been paid out of earnings, there is no evidence that the funds were not earned lawfully, no evidence that they were not rightfully the property of the company. Considerable or attractive dividends have not been paid. A denial of anything for going value on this ground cannot be sustained. That past high or excessive rates offer no bar to enjoining a present noncompensatory rate is a question we need not discuss.

It is said in *Lincoln Gas & Electric Light Co.* v. *City of Lincoln, supra:*

"Again, we question the propriety of the master's treatment of 'going value,' which he seems to have estimated at less than otherwise he would have placed it upon the theory that the company's business had been developed, at the expense of the public, in the expenditure of past earnings exceeding a fair return upon the capital invested, and this without any finding, or any clear evidence to which our attention has been called, that past earnings were excessive."

See, also, *Monroe Gaslight Case, supra; Newton* v. *Consolidated Gas Co., supra; Bluefield Waterworks Case, supra; Georgia Railway & Power Company Case, supra; Galveston Electric Co.* v. *City of Galveston,* 258 U. S. 388 (42 Sup. Ct. 351) ; *Houston Case, supra.*

The company was entitled to allowance for going value, the amount to be determined fairly by the commission from the facts, including the financial history of the company.

9. That an order of the commission is applicable to franchise contract rates in the cities of St. Joseph and Benton Harbor, is settled by the authorities and statutes reviewed in the opinion of the commission.

In briefs and argument, counsel on both sides, and for the city of Detroit and the other cities, have covered the questions very fully and thoroughly, and

have aided the court greatly. In fairness to the commission, it should be said that the record before us contains evidence which was not before the commission.

The bill of fees and expenses of the special commissioner, when approved by this court, will be paid by the State and by the utility in equal shares as provided by stipulation.

Writ denied, without costs.

SHARPE, MOORE, STEERE, and FELLOWS, JJ., concurred with CLARK, C. J.

BIRD, J. (*dissenting*). Attempt is being made to review in this court an order of the Michigan public utilities commission by mandamus proceedings rather than by the mode pointed out by the statute. In my opinion, this court should not review the merits of the commission's orders by mandamus proceedings. A review by that procedure not only violates the statute, but reverses the precedents of this court for upwards of half a century.

The Michigan public utilities commission made and entered an order against the Michigan State Telephone Company on July 12, 1922, reducing the telephone rates then in force in the city of Detroit and elsewhere in the State in the annual sum of $1,645,179. The Michigan State Telephone Company was displeased with this order. It desired to review the order of the commission. Being in this mood there was just one way, and only one way, it could do so in the State court, and that was to follow the statute, which prescribes that:

"Any telephone company or other party in interest, being dissatisfied with any final order of the commission made in any proceeding under this act, may within thirty days from the issuance of such order and notice thereof, commence an action in the circuit court, in chancery, against the commission as defendant to

vacate and set aside any such order on the ground that the certificate granted or withheld is not in accordance with the rights of the parties, that the rate or rates, charges, joint rate or rates fixed are unlawful or unreasonable, or that any such regulation, practice or service fixed in such order is unreasonable; in which suit the commission shall be served with a subpœna and a copy of the complaint. The commission shall file its answer and on leave of court any interested party may file an answer to said complaint. Upon the filing of the answer of the commission said cause shall be at issue and stand ready for hearing upon ten days' notice by either party. All suits brought under this section shall have precedence over any civil cause of a different nature pending in such court, and the circuit court shall always be deemed open for the hearing thereof, and the same shall proceed, be tried and determined as other chancery suits. Any party to such suit may introduce original evidence in addition to the transcript of evidence offered to said commission, and the circuit courts in chancery are hereby given jurisdiction of such suits and empowered to affirm, vacate or set aside the order of the commission in whole or in part, and to make such other order or decree as the courts shall decide to be in accordance with the facts and the law." 2 Comp. Laws 1915, § 6702.

This statute furnishes a complete and adequate remedy for reviewing the orders of the Michigan public utilities commission, and is the only remedy provided by statute for reviewing the validity and reasonableness of its orders. Yet, in the face of this statutory remedy, attempt is made to review the validity and reasonableness of the order of the commission by mandamus proceedings.

Upon the question whether this court would entertain a mandamus proceeding for the purpose of reviewing a case like the present one, where relator had an adequate remedy by appeal, this court has said:

"The writ of mandamus will not be allowed to take

the place of an appeal or writ of prohibition, or any other writ to review the action of the lower court." *Wells* v. *Montcalm Circuit Judge,* 139 Mich. 544.

In view of this language it is not clear by what right the Michigan State Telephone Company is permitted to review an order of the commission by mandamus proceedings in this court when the statute has expressly created an adequate remedy for that purpose in a court of chancery.

In *Mardian* v. *Wayne Circuit Judge,* 118 Mich. 353, in denying a petition for writ of mandamus, the court said:

"It is a well settled rule that mandamus will not lie when there is another adequate remedy. The following Michigan authorities will be found to sustain this rule: *People* v. *Jackson Circuit Judges,* 1 Doug. 302; *People* v. *Wayne County Court Judge,* 1 Mich. 359; *People* v. *Wayne Circuit Judge,* 19 Mich. 296; *People* v. *Allegan Circuit Judge,* 29 Mich. 487; *O'Brien* v. *Tallman,* 36 Mich. 13; *Stall* v. *Diamond,* 37 Mich. 429; *Olson* v. *Muskegon Circuit Judge,* 49 Mich. 85; *Delhi School District* v. *Ingham Circuit Judge, Id.* 432; *Lloyd* v. *Wayne Circuit Judge,* 56 Mich. 236 (56 Am. Rep. 378); *Perrin* v. *Lepper,* 56 Mich. 351; *Scott* v. *Wayne Circuit Judges,* 58 Mich. 314; *Burt* v. *Wayne Circuit Judge,* 82 Mich. 251; *Eyke* v. *Lange,* 90 Mich. 592, 104 Mich. 26; *Corby* v. *Wayne Probate Judge,* 96 Mich. 11; *Thomas* v. *Wayne Circuit Judges,* 97 Mich. 608; *Hall* v. *Wayne Circuit Judge,* 111 Mich. 395; *Aldrich* v. *Wayne Circuit Judge, Id.* 525."

To those cited in this case may be added more recent cases. *Michigan Mut. Fire-Ins. Co.* v. *Wayne Circuit Judge,* 112 Mich. 270; *St. Clair Tunnel Co.* v. *St. Clair Circuit Judge,* 114 Mich. 417; *S. K. Martin Lumber Co.* v. *Menominee Circuit Judge,* 116 Mich. 354; *Reed* v. *St. Clair Circuit Judge,* 122 Mich. 153; *Maynard* v. *Ingham Circuit Judge,* 124 Mich. 465; *Grand Rapids, etc., R. Co.* v. *Charlevoix Circuit Judge,* 133 Mich.

122; *Cattermole* v. *Ionia Circuit Judge,* 136 Mich. 274; *Roberts* v. *Lenawee Circuit Judge,* 140 Mich. 115; *Sharp* v. *Montcalm Circuit Judge,* 144 Mich. 328; *Hitchcock* v. *Wayne Circuit Judge,* 144 Mich. 362; *Cosgrove* v. *Wayne Circuit Judge,* 144 Mich. 682; *City of Flint* v. *Genesee Circuit Judge,* 146 Mich. 439; *Hartz* v. *Wayne Circuit Judge,* 164 Mich. 231; *Olds Motor Works* v. *Wayne Circuit Judge,* 164 Mich. 470; *Craig* v. *Ingham Circuit Judge,* 171 Mich. 33; *Trumbull Motor Car Co.* v. *Wayne Circuit Judge,* 189 Mich. 554. Many other Michigan cases might be cited to the same effect as this court has been steadily holding to this rule ever since it was created.

The rule appears to be the same in other jurisdictions:

"Appeal or writ of error alone will accomplish the purposes of review and correction, and mandamus will not be allowed to supplant these, in accordance with the general principle that where relief may be obtained through the ordinary channels of the law the writ is not an appropriate remedy: *Ex parte Morris,* 44 Ala. 361; *Ex parte Southern Telegraph Co.,* 73 Ala. 564; *Ex parte Williamson,* 8 Ark. 424; *Early* v. *Mannix,* 15 Cal. 149; *People* v. *Clerk of District Court,* 22 Colo. 280 (44 Pac. 506); *Shine* v. *Kentucky Cent. R. Co.,* 85 Ky. 177 (3 S. W. 18); *State* v. *New Orleans District Court,* 10 La. Ann. 420; *State* v. *New Orleans District Court,* 12 La. Ann. 342; *Olson* v. *Muskegon Circuit Judge,* 49 Mich. 85; *Haney* v. *Muskegon Circuit Judge,* 101 Mich. 392; *State* v. *Lubke,* 85 Mo. 338; *State* v. *Megown,* 89 Mo. 156 (1 S. W. 208); *People* v. *Superior Court,* 18 Wend. (N. Y.) 575; *Ex parte Bostwick,* 1 Cow. (N. Y.) 143; *People* v. *Lott,* 42 Hun (N. Y.), 408; *Ewing* v. *Cohen,* 63 Tex. 482; *State* v. *Morris,* 86 Tex. 226 (24 S. W. 393); *State* v. *Allen,* 8 Wash. 168 (35 Pac. 609); *State* v. *Superior Court,* 24 Wash. 438 (64 Pac. 727); *State* v. *Taylor,* 19 Wis. 566; *Ex parte Baltimore, etc., R. Co.,* 108 U. S. 566 (2 Sup. Ct. 876); *In re Morrison,* 147 U. S. 14 (13 Sup. Ct. 246); *American Construction Co.* v. *Railway*

*Co.,* 148 U. S. 372 (13 Sup. Ct. 758) ; *United States* v. *Swan,* 13 C. C. A. 77, 65 Fed. 647." 98 Am. St. Rep. 892, note.

Cyc. states the rule as follows:

"Mandamus will not lie where there is an adequate remedy by appeal or by writ of error" (citing numerous authorities from 25 different States). 26 Cyc. p. 173.

"The existence of a *specific statutory remedy will exclude mandamus.*" *Id.* p. 175.

The text last cited refers to the following Michigan cases: *Secretary of State* v. *National Salt Co.,* 126 Mich. 644; *Johnston* v. *Mitchell,* 120 Mich. 589; *Sherman* v. *Board of Sup'rs of Sanilac Co.,* 84 Mich. 108.

This text is directed to the precise situation that exists in this case. There is a specific statutory remedy provided by the statute. When this remedy exists no other will be permitted.

The rule as stated by R. C. L. is in accord with this. It is said:

"It is a general rule that the extraordinary remedy of mandamus cannot be resorted to in a civil proceeding to subserve the purpose of an appeal or writ of error; therefore, *where a statute gives the right of appeal from the decision of a board or tribunal to review its action, this is ordinarily deemed an adequate remedy so as to preclude the issuance of a mandamus to coerce such tribunal in respect to such matter,* and the same is held true where the matter may be reviewed on writ of error. Thus where the statute gives a right of appeal from the action of an excise board denying a license to sell intoxicating liquors, it is held that mandamus will not issue to compel the granting of the license; and it has been held by the Federal Supreme Court that where a remedy by appeal from the decision of the commissioner of patents is given by statute, mandamus will not lie to compel him

to issue a patent, as the remedy by appeal is adequate." 18 R. C. L. p. 133.

In *Jay* v. *O'Donnell*, 178 Ind. 282 (98 N. E. 349, Ann. Cas. 1915C, 325), an attempt was made as here to review the action of a board where an appeal was given by the statute. Jay was denied a license to sell intoxicating liquor by the board, and instead of taking advantage of the statutory appeal he attempted to coerce them by a writ of mandamus. In denying this application the court said:

"Section 22, Acts 1911, page 244, expressly authorizes an appeal from a decision of the board of commissioners in a proceeding before said board to obtain a license to sell intoxicating liquors as a beverage. When there is an adequate remedy by appeal mandamus will not lie" (citing several authorities).

This case presents the same question as is involved in the one under consideration, and the Indiana court held in accordance with the universal rule that the statute having given a remedy by appeal from the orders of the commission, mandamus would not lie. That is precisely the situation in this case. The legislature has created the Michigan public utilities commission, given it certain powers, provided for hearings and orders, and has further provided a remedy in a court of chancery if either party be aggrieved at its orders. When this is done it precludes all other remedies.

Another instance much like the present one is *United States* v. *Duell*, 172 U. S. 576 (19 Sup. Ct. 286). One Bernardin had been refused a patent. Instead of taking his statutory appeal he attempted to coerce the commissioner of patents by mandamus proceedings. Of this attempt the Supreme Court of the United States said:

"Nothing is better settled than that the writ of mandamus will not ordinarily be granted if there is another legal remedy, nor unless the duty sought to be enforced is clear and indisputable; and we think that under the circumstances, the remedy by appeal existed."

It has been suggested that inasmuch as the parties raise no objections to the jurisdiction of the court, the objections, if any thereto, are thereby waived. This suggestion might have some force were it not for the fact that this court has held on numerous occasions that parties cannot confer jurisdiction on this court by waiver or consent. *Riley* v. *Railway,* 163 Mich. 327; *J. F. Hartz Co.* v. *Lukaszcewski,* 200 Mich. 230; *Bolton* v. *Cummings,* 200 Mich. 234; *Miller* v. *Johnson,* 201 Mich. 535; *Monroe, Boyce & Co.* v. *Ward,* 207 Mich. 369; *Potaschnik* v. *Kaimola,* 216 Mich. 406.

It is also the practice of this court to raise jurisdictional questions itself, where they involve the subject-matter. *Bolton* v. *Cummings, supra; J. F. Hartz Co.* v. *Lukaszcewski, supra; Anway* v. *Railway,* 211 Mich. 592 (12 A. L. R. 26).

Where the legislature has specified the remedy it is somewhat difficult to understand how the parties, by commission or omission, can waive the provision of the statute.

In an effort to justify a departure from this well-settled rule, it is said that mandamus proceedings are being used to put into effect a rate made by the commission. It is a severe strain on one's credulity to believe that the Michigan State Telephone Company would seek and consent to an order to show cause against itself to compel it to do what it insists it cannot do, and if it does, it will confiscate its property. The claim is a mere subterfuge. The hearing in this court has proceeded as a review on the merits. Questions have been raised and argued in this court affect-

ing the validity of the commission's order precisely the same as though the statutory remedy by appeal had been invoked.

In a further effort to justify the proceeding it is stated that after the order was made by the commission defendant had its choice to review the order in the United States district court or in the State court. That it did file a bill in the United States court for an injunction on the ground that the rates prescribed by the order were confiscatory. That while this proceeding was pending the mandamus proceeding was adopted. Conceding this all to be true, it did not change the Michigan rule of procedure, and there is nothing in section 266 of the United States judiciary code which would justify a departure from the rule of the State court. When the telephone company elected to review the order in the State court there was but one lawful way to do it, namely, by the statutory remedy.

It is asserted with much confidence that an identical jurisdiction was entertained by the Kansas supreme court in *State, ex rel. Hopkins,* v. *Telephone Co.* (Kan.), 223 Pac. 771, P. U. R. 1924D, 388.

The case referred to is a review of public utility questions by mandamus proceedings, but the Kansas statute, *in express terms,* authorizes the commission to "compel compliance with the orders of the commission by proceeding in mandamus, injunction or other appropriate civil remedies." * * * Kansas Rev. Stat. 1923, § 66-139.

The State of Kansas has provided no specific procedure to review orders of its public utility commission. It has, however, provided that the public utility commission may enforce its orders by mandamus, etc. The Kansas case, therefore, does not support the assertion that this court has jurisdiction,

for the very good reason that the legislature in this State has expressly prescribed the mode of procedure if a review is desired.   The cases differ in this:   The Kansas court proceeded in that case in obedience to its statute, whereas this attempt is in violation of the statute of Michigan, and is also in violation of the settled rules of this court.

A part of the net gain to the telephone company by reason of this legal circumlocution has been to avoid the force of the following provision of the statute:

"No injunction shall issue suspending or staying any order of the commission, except upon application to the circuit court, in chancery, or to the judge thereof, notice to the commission having been given and hearing having been had thereon."   2 Comp. Laws 1915, § 6703.

Beside this the company has gained an extension of time for at least one year in which to charge a rate which the commission ordered reduced.   It is well known that where issues are framed in mandamus proceedings and referred to a master to take proofs and make findings, it is always a slow and painful method.   This instance has been no exception.   It has consumed at least double the time that would have been consumed by the summary remedy for appeal provided by the statute.

It is rather unfortunate that it should become necessary to raise a question of practice in a matter of so much importance.   When, however, the statute is ignored and the settled precedents of the court are transgressed, the question should be interposed in big cases as well as small ones.

The "order to show cause" should be dismissed because improvidently issued.   No steps having been taken to review the order of the commission by the statutory appeal within the statutory time the rates

fixed by the order of the commission should be declared to be in force.

WIEST, J. (*dissenting*). I cannot concur in the opinion of the Chief Justice nor in that of Mr. Justice BIRD.

This court has jurisdiction. Whether rates fixed by or under legislative authority are unreasonable is a judicial question. Rate-making, for public utility service, is primarily a legislative function; it may be delegated to a commission created and empowered by legislative enactment, but rates established must admit of judicial review as to lawfulness. Identical jurisdiction was entertained by the supreme court of Kansas in *State, ex rel. Hopkins*, v. *Telephone Co.* (Kan.), (223 Pac. 771, P. U. R. 1924D, 388). The order of the public utilities commission, and the findings and conclusions of the special commissioner confirmatory thereof, are presumed to be correct in fact and in law, but the exceptions to the report of the special commissioner and the assertion that the order of the utilities commission is unreasonable and confiscatory requires this court to examine the evidence and come to an independent conclusion thereon. We do not, of course, fix rates, but only determine whether the rates fixed are unreasonable and, therefore, confiscatory.

The commission invoked the judicial power of this court and this enabled the telephone company to invoke protection of its property rights. One test of jurisdiction is the effect of judgment herein between the parties before the court. Under the issues presented, a determination by independent conclusion, upon the evidence, will bind the parties. *Van Wert Gas Light Co.* v. *Public Utilities Commission*, 299 Fed. 670, P. U. R. 1924C, 722.

I dissent from the opinion of the Chief Justice upon the question of depreciation reserve. The deprecia-

tion reserve was something more, in this instance, than a mere book entry.   A utility, not acting under public regulation, may set up a depreciation reserve and up-set the same at will, but a utility under public regulation, asking for, and receiving a return for the purpose of establishing a replacement fund on a life-table basis, has received from ratepayers a fund, the regulatory commission was bound to grant, and a correlative duty rests upon the company to employ the fund for the purpose it was asked for and received and for none other.   The creation of this depreciation reserve, or, more correctly speaking, replacement fund, was empowered by law and the rate was approved and the purpose thereof declared by commission order. It was authorized for a purpose, accumulated for a purpose and diverted therefrom.   It was impressed with the purpose of maintaining the rate base and amortizing the investment and could not be employed to increase the rate base.   A depreciation reserve is permitted and set up to protect property rights and not to be otherwise capitalized.   It maintains interests of the investors but it does not create any added interest.   The ratepayers may not be required to establish a depreciation reserve and then, held as underwriters, to pay a return thereon if the reserve is employed to extend and enlarge the plant.   Depreciation reserve is not a part of the capital paid back to the company for the purpose of increasing the value used and useful in supplying service and, therefore, swell the rate base.   It is paid to replace capital investment used up, in fact or theoretically, in the service rendered.   It is to keep good the investment and to save the investors from loss, but not to increase in any way the rate base upon which the users are made to pay a return.   There seems to be no deferred maintenance involved here.   There is evidence

of lessening of worth arising from wear and the action of the elements and obsolescence and there is also evidence of appreciation. This reserve was intended to amortize the investment. Instead it has been employed to extend and enlarge the investment. This, instead of replacing equipment, adds thereto and, by increasing the rate base, swells the return to be made by the ratepayers. It constitutes no increase of investment by the owners but is a contribution exacted from the ratepayers for a lawful purpose, diametrically opposed to increase of value and this prevents the same from being diverted to capital investment.

I do not understand that the depreciation reserve in question has been employed to meet current depreciation. If it had been it would not increase the rate base. The reserve was given to maintain the integrity of capital investment. The law exacts it for such purpose and will not permit it to be employed in extensions and thereby first compel the ratepayers to create a fund and thereafter pay a rate thereon to the company. The service now rendered is practically 100 per cent. use of the present equipment. This negatives past and prospective depreciation beyond current maintenance. But it is said there is a limit to the usefulness of equipment and a life-table is set up. This is mere theoretical depreciation. This plant, as a whole, will never run, until some day, like the "one-hoss-shay," go all to pieces. The theory of a depreciation reserve, as distinguished from a replacement reserve, in the case of a utility like defendant's, which has reached its gait, is indefensible, duplicates current expense of maintenance, creates a fund based on theory and never supported by eventual conditions and offers a temptation to employ the same to swell the capital investment and increase the rate base. The replacement reserve, having been invested in additions and taken into consideration in determining the fair

value of the property used and useful, should be taken out. It was taken out by the commission, and I approve of the deduction. Existing observable depreciation was considered by the commission and deducted in fixing the present value. This was proper.

Going Concern Value. The history of this company precludes right to a percentage addition for going concern value. It is impossible to find the value of the tangible assets without consideration of the established business. The commission was right in so giving consideration to the subject and the valuation fixed adequately reflects going concern value.

American Telephone & Telegraph Company Contract. The American Telephone & Telegraph Company owns all of the common stock and nearly all of the preferred stock of the Michigan State Telephone Company. No court has yet held that a rate must be established to care for the four and one-half per cent. contract regardless of the value of services rendered by the American Telephone & Telegraph Company. Suppose the contract called for fifty per cent. of the gross revenues of the Michigan State Telephone Company? Except as intensified, the question would be the same. In considering this contract the distinction must be kept in mind between mere contract cost and the value of services actually rendered. Corporate management and not courts make contracts, but courts, and not corporate management, determine, in a rate case, what return will cover the services rendered under a contract, and will not say a return fully compensatory for actual services rendered is unreasonable and, therefore, confiscatory because less than such a contract as we have here stipulates.

We find a hand reaching for rate returns, the fingers of which are those of the local company but the manipulating arm is that of the American Telephone &

Telegraph Company, which owns the local company. As blind old Isaac said: "The voice is Jacob's voice, but the hands are the hands of Esau."

The possible vice in this contract is not met by saying that the relation between the companies demands strict scrutiny of the dealings but the contract is valid and management of the utility must be left to the owners. What purpose does strict scrutiny serve if the result thereof may not, in any event, affect contract stipulations?

The ratepayers must compensate for the services rendered. Tangible property and intangible property rights enter into the measure of service rendered. What service is rendered ratepayers under the American Telephone & Telegraph contract? The commission measured what they considered the actual services rendered. Defendant company stands upon its contract with its owner. The commission planted decision upon actual services rendered.

Case law, text writers and experts are at variance upon the questions involved. I have given my views without larding the opinion with supporting authorities.

I approve of the findings of the commission. The writ should be granted.

McDONALD, J., concurred in the result reached by WIEST, J.